**ASSOCIATED FILM DISTRIBUTION CORPORATION, et al.**

v.

**The Honorable Dick THORNBURGH, et al.**

**Civ. A. No. 80–1179.**

United States District Court, E.D. Pennsylvania.

Aug. 5, 1985.

---

**1102**

Barbara Kacir, Richard I. Werder, Jr., Jones, Day, Reavis & Pogue, Cleveland, Ohio, Carole E. Handler, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiffs.

Karen E. Katzman, Andrew Macdonald, Kaye, Scholer, Fierman, Hays & Handler, New York City, Richard M. Squire, Cohen, Shapiro, Polisher, Shiekman and Cohen, Philadelphia, Pa., for Fox Theatres Management Corp.

H. Donald Busch, Lewis A. Grafman, Karen A. von Dreusche, Busch, Grafman & von Dreusche, Bala Cynwyd, Pa., for Budco Quality Theatres, Inc.

LeRoy S. Zimmerman, Atty. Gen., Gregory R. Neuhauser, Deputy Atty. Gen., Allen C. Warshaw, Chief Deputy Atty. Gen., Harrisburg, Pa., for the Governor and Attorney General of Pa.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, District Judge.

I uphold the constitutionality of the Pennsylvania Feature Motion Picture Fair Business Practices Law.[1] That Act regulates certain trade practices in the licensing relationship between those who distribute films and those who exhibit them. The distributors contend that the Act violates their rights to freedom of speech, offends the right of Congress to regulate interstate commerce, is preempted by federal copyright legislation, and is contrary to the Pennsylvania Constitution's prohibition of "special laws."[2]

### I. Background: Mutual Dependency

The relationship between exhibitors and distributors is one of mutual dependence. Distributors need theatres in which to play their films; exhibitors need films to play in their theatres. This symbiotic relationship has given rise to a long history of sharp dealing. *See United States v. Paramount Pictures*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

The plaintiffs in this action are the major distributors of motion pictures in the United States. They distribute most films. Those which they do not distribute are released by foreign companies or small independents.

Although there are national theatre chains, most theatres in Pennsylvania are owned by local chains or by independent exhibitors. The exhibition business in some areas of the Commonwealth is competitive, while in other areas a chain or an individual owns all the theatres. If a distributor wishes to play a film in a certain area, it must license that film to an exhibitor in that area. Not all theatres are alike. Factors such as seating capacity, location, and parking are important in what is a prime theatre.

All exhibitors depend on the product available from distributors. Theatre owners need new pictures on their screens. Exhibitors fear the mythical screen without a picture; distributors fear the mythical film without a theatre.

During the peak seasons, Christmas, Easter and summer, there is usually ample product for exhibitors. At other times, however, distributors release fewer films. This is a problem for both small exhibitors operating one theatre and for the giants of the exhibition field who own all the screens

---

1. 73 P.S. §§ 203–1 through 203–11.

2. The history of this case includes a grant of summary judgment for the plaintiffs on the grounds that the Act violated the First and Fourteenth Amendments and the Supremacy Clause of the United States Constitution. *See Associated Film Distributors, et al. v. Thornburgh*, 520 F.Supp. 971 (E.D.Pa.1981) (hereinafter *AFD* I). The Court of Appeals reversed the order. 683 F.2d 808 (3d Cir.1982) (hereinafter *AFD* II).

in an area. The more screens an exhibitor owns, the more devouring its need for film product. While a theatre owner can subsist on the average film, the eternal hope is to garner a blockbuster.

Distributors license films by two methods, bidding and negotiation. The Pennsylvania Act defines a bid as

> [a] written or oral proposal by an exhibitor to a distributor, which proposal is in response to an invitation to bid or negotiate and states the terms under which the exhibitor will agree to exhibit a feature motion picture.

73 P.S. § 203–3.

In practice, distributors use bidding in areas where competition among exhibitors exists. Although bidding may take place over the telephone, normally the distributor sends exhibitors in the area an "invitation to bid" which contains a brief description of the film, the time at which it will be available and the suggested licensing terms. The exhibitor submits a bid which will include not only financial terms, but also minimum length of run and any requested "clearances" over other theatres in the area. A clearance is an assurance that another theatre will not obtain the same film. The distributor, taking into account both the quality of the theatre and the terms of the bid, presumably selects the most favorable bid. The distributor can reject all bids. Before the Pennsylvania Act, the distributor could negotiate with individual theatres after rejecting all bids. Traditionally, terms on licenses procured by bidding are "firm"; the distributor will not be expected to reduce the agreed terms if the picture is unsuccessful.

Distributors normally use negotiation in areas where there is little or no competition among exhibitors. Under negotiation, a representative of the distributor contacts a specific exhibitor and, without soliciting other offers, attempts to work out a licensing arrangement. Traditionally, terms under negotiated licenses are not firm. If a picture bombs, the distributor may renegotiate the terms downward.

Another method of licensing is "competitive negotiation." Competitive negotiation is oral bidding. The distributor contacts the exhibitor and indicates that he is soliciting offers from more than one theatre. As with bidding, the industry practice is that terms licensed under competitive negotiation are considered firm.

In the 1950's and 1960's films were usually licensed by flat rental or by a sliding scale in which exhibitors paid a higher percentage of the box-office gross as the gross increased. As time went on, distributors stopped using sliding scales and flat rentals. Film rental is now calculated by percentage rental and a house allowance. Under this system, the distributor and exhibitor agree on a house allowance, a specific dollar amount which is supposed to represent the exhibitor's weekly expenses. The exhibitor keeps 10% of the weekly gross above this house allowance; the remaining 90% inures to the distributor. The contract, however, almost always provides that the distributor will receive a minimum percentage of the box office gross. The amount of this minimum percentage has increased over the years. Currently, the distributor usually demands a minimum of seventy percent of the box office gross for the first week of the exhibition (or "run"). The percentage decreases in the succeeding weeks of the run.

Several events occurred in the past few decades which have made business more difficult for exhibitors. The first was a significant decrease in the amount of film product available. The second was the increase of "blind bidding," defined in the Pennsylvania Act as

> [b]idding, negotiating, offering terms, accepting a bid or agreeing to terms for the purpose of entering into a license agreement prior to a trade screening of the feature motion picture that is the subject to the agreement.[3]

73 P.S. § 203–3.

A consent decree between most of the major distributors and the United States De-

---

**3.** A trade screening is the showing of a feature

motion picture by a distributor which is within

partment of Justice limited blind bidding between 1968 and 1975 by preventing the distributors from blind bidding more than three pictures per year. When the decree expired, the practice of blind bidding increased dramatically. By the late 1970's most films, and virtually all those that were considered potential "blockbusters," were blind bid.

Economic power is highly concentrated in the hands of a few distributors who control most feature films. Concentration of exhibitors in local markets is growing. In the business relationship between distributors and exhibitors, the distributors probably have the upper hand.

## II.  *Making a Motion Picture*

Making a film is a complicated process, characterized by ingenuity in adjusting. While it may be true that there is no business like show business, show business is also big business. An average movie costs ten to twenty million dollars to make and distribute.

It is difficult to predict how long it will take to make a film. Target dates are set before shooting begins. Such factors as script revision, the health of stars and key members of the crew and the weather can cause significant delays. Principal photography lasts three to five months. When shooting is finished, the post-production process begins. Post-production may take up to a year. It is during this time that music and special effects are added, the quality of the sound and color are improved and the film is edited.

During post-production, a "rough cut" of the film is made from the original negative. The director turns the "work-in-progress" into a finished product. Some directors work quickly, others at a snail's pace.

The main circumstances which may slow the production and post-production processes have always existed and have nothing to do with legislation. It is often necessary to accelerate post-production by adding technicians, renting extra equipment or paying for costly overtime. Once a release date for a film is set, changing that date is expensive. Distributors buy national television advertising time for a film a year before its release. A delay in release means decline in the effectiveness of the advertising. Postponement forces the filmmaker and distributor to incur extra interest costs, creates a risk that a timely film will become stale, and may cause a film to miss a prime release season. Acceleration is the way the problem is solved. It is rare for a film to miss its release date.

## III.  *The Pennsylvania Act*

The Pennsylvania Feature Motion Picture Fair Business Practices Law was enacted in 1980. The legislature described its purposes in passing the Act in 73 P.S. § 203–2:

The General Assembly of the Commonwealth of Pennsylvania finds and declares that the licensing and distribution of feature motion pictures to theatres in this Commonwealth, including the rights and obligations of distributors and exhibitors, vitally affects the general economy as well as the access of the public to works of artistic expression and opinion. In order to promote the public interest and public welfare of this Commonwealth to:

(1) insure unabridged access for the public to artistic expression and opinion in feature motion pictures at reasonable prices and at many different locations;

(2) avoid undue control of the exhibitors by the distributors;

(3) foster vigorous and healthy competition in offering feature motion pictures for the benefit of the public by prohibiting practices through which fair and honest competition is restrained, destroyed or inhibited;

(4) promote the wide geographical dissemination at reasonable prices to the public of ideas, opinions and artistic expression in feature motion pictures;

(5) prevent delay in the exhibition of feature motion pictures to the public in

the Commonwealth and is open to any exhibi-                      tor.  *See* 73 P.S. § 203–3.

theatres playing subsequent to the first run showing;

(6) prevent theatres from unnecessarily going out of business, thereby resulting in reducing the number of small independent businesses and unemployment with loss of tax revenues and other undesirable consequences;

(7) prevent unfair and deceptive acts or practices and unreasonable restraints of trade in the business of distribution and exhibition of feature motion pictures within the Commonwealth;

(8) promote fair and effective competition in that business;

(9) benefit the movie going public by limiting the long and extensive first runs so that additional theatres, in a given area, may also exhibit the same feature motion picture and at possibly a lower admission price; and

(10) prohibit blind bidding by insuring that exhibitors have the opportunity to view a motion picture and know its contents before committing themselves to exhibit it in their communities;

it is necessary to legislate regulations and standards pursuant to the exercise of the police power of this Commonwealth governing the relationship between feature motion picture distributors or licensors and exhibitors serving the public by establishing fair business practice procedures for the licensing and distribution of feature motion pictures within the Commonwealth of Pennsylvania and to provide remedies for the violation of this act, including damages and attorneys' fees.

In order to effectuate the objectives described, the Pennsylvania Act regulates the licensing of films in the Commonwealth.

First, the Act flatly prohibits the practice of blind bidding. The act prevents exhibitors and distributors from negotiating for a license or entering into a licensing agreement before a film is trade screened in Pennsylvania.[4]  73 P.S. § 203–4.

The Act does not permit licensing agreements to include provision for the payment of guarantees or advances. 73 P.S. § 203–5, 6.  A guarantee is a promise by the exhibitor to the distributor to pay a minimum fixed dollar amount regardless of box office gross.[5]  When a film does not earn as much as its guarantee, the difference is "unearned film rental." This sum is not refundable. An advance is a promise by the exhibitor to pay part of the film's anticipated rental to the distributor before the exhibition. If the film rental does not equal the advance, the distributor is supposed to refund the difference.

The Act also contains a "42-day clause," which prevents distributors from granting exhibitors exclusive runs for more than 42 days without making provision to expand the run to other theatres within the geographical area.[6]  73 P.S. § 203–7.

The Feature Motion Picture Fair Business Practices Law also regulates bidding procedures. 73 P.S. § 203–8. It requires open bidding. Those exhibitors who submitted bids have a right to be present when bids are opened. Within sixty days after bids are opened, a bidding exhibitor may examine any bid that was made for that particular run, even if the distributor has rejected all bids. When a distributor ac-

---

**4.** Approximately one half of the states have enacted similar trade screening requirements.

**5.** The Act prohibits guarantees only where payment to the distributor is otherwise based in whole or in part on attendance or box office receipts. Thus, the Pennsylvania Act does not forbid distributors and exhibitors from entering into agreements where the exhibitor's only payment to the distributor consists of a "flat rental."

**6.** § 203–3 of the Act defines a "run" as:

[T]he continuous exhibition of a feature motion picture in a defined geographical area for a specified period of time. A "first run" is the first exhibition of a feature motion picture in the designated area; a "second run" is the second exhibition and "subsequent runs" are subsequent exhibitions after the second run. "Exclusive run" is any run limited to a single theatre in a defined geographical area and a "nonexclusive" or "multiple run" is any run in more than one theatre in a defined geographical area.

cepts a bid, it must notify all the bidding exhibitors of the identity of the successful exhibitor and the terms of the successful bid. The Act also requires rebidding. If a distributor rejects all bids, it must so inform all bidding exhibitors, issue new bid solicitations, and bid the film again. Thus, once a distributor chooses to license by bidding, it cannot switch to negotiation if the terms offered in the bids received prove disappointing.

## IV. The Effect of the Act

The effect of the Act on the motion picture business is relatively minor. Both sides exaggerate its effect. The extravagant claims of the parties give rise to a mythology about the effects of the Act which far outdistances the credible evidence. The distributors' claims, unsupported by credible evidence, range from complaints that the Act inhibits the artistic development of pictures to complaints that compliance with the Act requires expenditure of great sums for distribution, promotion and marketing. There were claims that the Act has contributed to the elimination of certain types of special effects and has precluded the use of shopping mall promotions. The exhibitors, on the other hand, claim that the Act is a panacea protecting them from their helplessness in the market place against the overwhelming market power of the distributors. In fact, there are both distributors and exhibitors who are unfair competitors. The distributors' history includes the practices leading to the *Paramount* decree. Some exhibitors have engaged in collusive conduct by agreeing to split available film with competitors. The range of unfair practices by both sides is extensive. While distributors have often misrepresented the quality, nature and critical reception of a film, powerful exhibitors have often oppressed smaller competitors by using their deeper pockets to offer guarantees unrelated to the merits of a bidding situation. Favored arrangements between large distributors and large exhibitors led in the past to sneak looks at competitors' bids. Clearances for some theatres unreasonably restricted wide and prompt dissemination of films. "Customer relationships" still exist, in which some exhibitors commit screens to particular distributors long before trade screening. There are also claims of sham bidding, where an exhibitor bids high terms but consistently pays at a lower renegotiated rate.

Against this background of seamy conduct and exaggerated claims, the Pennsylvania Act modestly regulates a variety of unfair trade practices. The Act does not restructure the movie industry, nor does it address all its inequities. The failure of the law to correct all of the problems of this complex and sometimes shady business, however, is no reason to strike down a modest effort at reform.

## A. The Trade Screening Requirement

Plaintiffs have attacked the trade screening requirement of the Pennsylvania Act on several grounds. The distributors maintain that they prefer to trade screen whenever possible. They allege, however, that the trade screening requirement causes delay in the release of motion pictures and that, because they cannot license until after a film has been screened, they are often foreclosed from prime theatres.

The distributors see themselves faced with a Hobson's Choice. Delaying a release date is costly and, because timing can be a key element in a film's success, potentially disastrous. The other alternative is to accelerate work on the project in order to complete a "trade screening" print to be shown to exhibitors. Such prints represent the work-in-progress and are not equivalent to the print ultimately released to the public. The distributors complain that this process diverts resources from the completion of the final print, is extremely expensive, and is wasteful because trade screening prints are ultimately useless. They claim that trade screening prints are usually incomplete, unpolished and, therefore, in no way representative of the final product. The evidence at trial, however, showed that there are substantial benefits to trade screening and that the burdens alleged by plaintiffs have been overstated.

The main benefit of the trade screening requirement is prevention of certain deceptive trade practices by distributors. The evidence supported the notion that before trade screening legislation, distributors were licensing films by tactics ranging from exaggeration to outright misrepresentation.

In the days of blind bidding, licensing often took place about a year before the actual release of a film. The only information an exhibitor received about a picture besides industry rumor was the puffing contained in a brief bid solicitation letter. The letters usually included the name of the film, the director and a paragraph summarizing the plot. Such letters uniformly described the upcoming film in glowing terms. With this information, the exhibitor had no rational way to differentiate a blockbuster from a disaster, nor could it determine whether a film would play well in a particular area. Bid solicitation sometimes passed beyond hype into deception.

A 1977 bid solicitation for "THE SWARM" promised "another giant spectacular." The letter touted the film as starring several celebrities. By the time these letters were sent out, however, Warner Brothers had already performed a study of marketing opportunities for "THE SWARM," which showed little audience interest in seeing the film. Moreover, most of the actors advertised as "starring" in the movie had only cameo roles. The film was a disappointment at the box office. As a result of a lawsuit brought by Texas exhibitors against Warner Brothers under the Texas Deceptive Practices Act, a jury in federal district court in Texas explicitly found that Warner Brothers committed false, misleading or deceptive acts or practices.[7]

A more recent example is the Paramount film, "BEST DEFENSE." The bid solicitation stated that Dudley Moore and Eddie Murphy would "join forces in an all-out assault at the military and the funnybone." The movie was touted as "a rare and extraordinary treat, bringing together two of the screen's hottest and most versatile comic giants...." In fact, Murphy was on screen for only fifteen to twenty minutes and he and Moore did not have one scene together.

Exhibitors admit that their judgment on films is far from perfect, but testimony supported the common sense notion that the best way to evaluate the box office potential of a film is to see it. Knowing a film's stars, its director or the book on which it is based is no substitute for actually seeing the film. It does not matter that the sound and visual effects or editing are incomplete. The overall impression of the story and performances are the most important features in judging a film and they can be assessed even when the film is screened with an unfinished print.

Trade screening also allows exhibitors to determine whether a film is likely to sell to their particular community. Films which are blind bid have often not received a rating from the Motion Picture Association of America at the time they are licensed.

Trade screening allows exhibitors to predict at which location a film will receive the best reception. Even large exhibitors who license virtually every picture gain from trade screening, which allows them to judge whether to place a given picture in a large or small theatre and to vary their bid according to what they perceive to be the worth of the film.[8]

---

7. The jury, however, failed to find that those acts or practices proximately caused injuries to the plaintiffs. *See Presidio Enterprise, Inc. et al. v. Warner Brothers Distributing Corporation,* Civil Action No. A–79–CA–290 (W.D.Texas).

8. Some exhibitors maintain customer relationships with distributors in which they commit screens to that distributor in advance of trade screening. The plaintiffs argue that this undercuts the need for anti-blind bidding legislation.

Customer relationships, however, are not universal. Small exhibitors do not have such arrangements. Those large exhibitors with customer relationships contend that they have only tentatively committed a screen to a certain company. The decision of what film to play on which screen has not been made. Trade screening also determines the terms they will bid for the film. Even with a customer relationship, an exhibitor is unlikely to offer high percentage

The plaintiffs contend that trade screening cannot be too important to exhibitors because of sparse attendance at some screenings. They base their argument on sign-in sheets for screenings. These sheets are somewhat misleading. One exhibitor had no recollection of ever being asked to sign in. Major exhibitors almost always send a representative and many small exhibitors sometimes employ a single booking agent to license films.

The plaintiffs concede that screenings for films rumored to be potential blockbusters are well attended. These are the movies for which an exhibitor may bid high terms and a long run. If an exhibitor licenses such a picture on those terms and the picture proves to be a flop, the exhibitor, especially the small one, may be faced with disaster. The Pennsylvania Act allows movie exhibitors to use their own judgment to determine whether such a film will succeed. The public benefits from requiring reasonable disclosure to afford the opportunity of an informed choice.

One ancillary benefit to trade screening is its benefit to unknown but worthwhile film makers. Trade screening allows exhibitors to judge films on what they perceive as real worth, rather than purely on the basis of reputation. Successful films which would otherwise be passed up because they contain unknown quantities receive more exposure. This may benefit the smaller and often more innovative distribution company.

While the benefits of the trade screening requirements are substantial, the burdens alleged by the plaintiffs are overstated.

There was a great deal of testimony about the costs of delaying a film's release date. Trade screening legislation, however, has simply not caused delay in the release of motion pictures. Plaintiffs point to a handful of films which missed their release dates, none because of the trade

screening requirement. Meeting the deadline for producing a trade screening print is a burden which plaintiffs exaggerate in this litigation; the real world burden is the deadline of a national release date. The latter deadline causes the costs which plaintiffs attribute to the trade screening requirement. If a film comes close to meeting its production schedule, there will be no delay because of trade screening. A distributor can successfully license a film within 24 to 48 hours of trade screening. There are, of course, films delayed because of factors unrelated to the trade screening requirement. These other factors may include a director who takes an extraordinarily long time to edit a film or the illness of a star. The distributors made no credible showing that the trade screening requirement has had any effect on the number of films that missed their release date.[9]

Plaintiffs contend that the trade screening requirement reduces the effectiveness of advertising because it usually prevents films from being licensed to specific theatres until shortly before release. These contentions are unfounded. Local advertising can link a film to a theatre on short notice before release. National advertising tends not to be theatre specific and such advertising can therefore appear in advance of licensing. The evidence indicated, in fact, that there has been no change in strategy concerning national advertising because of the Act.

The plaintiffs also complain that because they cannot license their films far enough in advance they are often precluded from placing their movies in prime theatres. The requirement of trade screening pictures does not foreclose distributors from access to the more desirable theatres at peak seasons. Before the Act, distributors could book theatres long before the product was available. The Act changes the race's starting line to the availability of a

terms or a long run if a picture does not seem likely to do well.

9. The Court gave little weight to the testimony actually offered that a given film was delayed because of the trade screening law. Such testimony was presented in a conclusory fashion and was not very helpful to the Court's resolution of the complex issues presented in this case.

trade screening print. It gives the race to the swift producers of movies rather than to the swift pre-emptors of theatres. In doing so, it makes the merits of the films more relevant. Moreover, the industry as a whole is not injured. If one company has production difficulties and is unable to screen its new film until a month before the release date, the company which finished its film according to schedule and trade screened two months in advance benefits. This is hardly an irrational result.[10]

Plaintiffs' next complaint is that the act forces the production of a separate trade screening print which is expensive to make and diverts valuable resources from the work being performed on the final print. As to the first contention, the costs of producing a trade screening print are insignificant when compared to other production and post-production expenses. The oft-told tale of the horrors of inconvenience in using the corporate Lear Jet to shuttle a trade screening print between cities makes one wonder from what important missions the jet was diverted. As to the second contention, plaintiffs' own witnesses testified that acceleration of post-production has always been a way of life in the movie business. There was no credible evidence that the diversion of resources to make a trade screening print has had any effect on the quality of pictures being released.

The distributors have also contended that a trade screening print is simply not representative of the final product. Such prints often lack titles, music, color-coding and various other special effects and finishing touches. The exhibitors who testified, however, all agreed that the quality of the prints is adequate to judge the basic worth of the film.[11] Also telling is the fact that certain distributors have on occasion shown trade screening prints as sneak previews for audiences and the press.

### B. *Guarantees and Advances*

The most troublesome regulation in the Pennsylvania Act is the prohibition of guarantees and advances.[12] The distributors' mythology is that guarantees and advances enable small town exhibitors to obtain films earlier than they otherwise would by ensuring that the distributor will receive enough to cover the cost of the print. The exhibitors' claim is that the law against guarantees and advances is necessary to protect them against the extortionate demands of the distributors against which they are otherwise helpless. I do not believe either claim.[13] I do find, however, that there is significant public benefit to the prohibition of guarantees and advances and that the burdens of such provisions are minimal.

The most significant benefit of prohibiting guarantees and advances is the protection of independent exhibitors from the predatory practices of larger exhibitors. Large exhibitors often use their deep pockets to put up substantial guarantees and advances. The small exhibitor simply can-

---

10. Plaintiffs' farfetched claim that the act effectively precludes the use of mall promotions because such promotions must be planned long in advance and must be tied to a theatre which will show the film is without merit. There are myriad methods to promote and advertise new films unaffected by the passage of the Pennsylvania Act.

11. The Court viewed the first reels of two trade screening prints and compared them to the finished prints of those reels. Although there were clear differences between the unfinished and final prints, the trade screening prints adequately represented the final versions. I felt able to determine the nature of the films from the screening prints. Moreover, both films contained disclaimers that the prints were unfinished.

12. The Ohio statute regulating licensing practices in the movie industry does not outlaw all guarantees and advances, but forbids conditioning licenses on the payment of guarantees and advances. Thus, distributors may not solicit guarantees and advances, but exhibitors may offer them. Moreover, the Ohio Act regulates only advances more than fourteen days before the first exhibition of a picture. Ohio R.C. § 1333.06.

13. The exhibitors' claim that the distributors' use of guarantees is unfair had more validity when blind bidding was permitted. There was a great deal of testimony about exhibitors losing large sums of money because they put up substantial guarantees based on inaccurate information about a film.

not compete fairly even if his theatre and the terms he offers are as good or better than the larger exhibitor.[14] He may have to seek bank financing to pay even a modest guarantee or advance.

An exhibitor with a deep pocket is able to put films beyond the reach of a smaller competitor regardless of which theatre is the more appropriate showcase. It is to the public's benefit that there be competition in exhibiting films and that large exhibitors do not squeeze smaller ones out of business.

Plaintiffs' position that guarantees and advances help small exhibitors break into the market and allow theatres in small towns to obtain film is unsupported by credible evidence. Unless two theatres are relatively equal, distributors choose on the basis of box office potential. A smaller, less attractive theatre will rarely, if ever, beat out a larger, more attractive theatre in a good location. Moreover, plaintiffs' own expert testified that a guarantee is a useful competitive tool for an exhibitor only when it is substantial enough to approximate the amount the distributor expects to earn from the license. Offering a marginal sum as a guarantee will not help the small exhibitor who would find it impossible to come up with a guarantee sizeable enough to secure a film.

The credible evidence also fails to support plaintiffs' theory that films which would otherwise not play in small towns are able to appear when exhibitors can offer guarantees large enough to cover print costs. There was testimony from exhibitors with theatres in small communities that they had at times attempted to buy a film print in order to show a particular film. These offers were rejected. The experience of these exhibitors was that guarantees had never made the difference in obtaining or not obtaining a film.

When exhibitors put up sizeable guarantees on films which produce disappointing box office receipts, they often play these pictures for longer than they normally would to reduce losses. Despite sagging popularity, exhibitors milk the runs of such films to the exclusion of otherwise available movies. Thus, the prohibition of guarantees benefits the public by reducing the incentive of exhibitors to play motion pictures beyond their useful life.[15]

Again, plaintiffs overstate the burdens arising from the prohibition of advances and guarantees. They claim that guarantees moderate the risk the distributor takes in producing a film by shifting some of that risk to exhibitors. Plaintiffs' statistical study indicated that in unregulated periods in Pennsylvania, 4.3% of plaintiffs' total film rental was unearned guarantee income. Plaintiffs' own economics expert testified that the presence or absence of guarantees does not have a significant impact on film rental.

Plaintiffs argued that advances serve the purpose of assuring payment from exhibitors who are considered poor credit risks or slow payers. There are, however, other effective methods to deal with film rental delinquencies. One such method is not supplying film to delinquent exhibitors. There was also evidence that advances were often solicited from exhibitors with excellent payment records, casting doubt on plaintiffs' argument about the purpose of advances. When film rental does not equal the advance, the distributor does not usually repay the theatre owner at the end of the run, but holds the money as a credit balance until the next picture. Such a practice is onerous for the small exhibitor. While both distributors and exhibitors pay their debts to each other with small honor, there is no credible evidence that the prohibition of advances materially affects the

---

**14.** At trial, a representative of AMC, the third largest exhibitor in the country, testified that his company viewed guarantees as a "viable" method of licensing film. Other witnesses from large exhibition chains freely admitted offering sizeable guarantees when competing against smaller theatres.

**15.** There was also evidence that some exhibitors occasionally raised ticket prices on films for which they paid large guarantees.

credit relationship or the collection of debts.[16]

## C. *The 42 Day Clause*

§ 203–7 of the Pennsylvania Act provides:

No license agreement shall be entered into between distributor and exhibitor to grant an exclusive first run or an exclusive multiple first run for more than 42 days without provision to expand the run to a second run or subsequent run theatres within the geographical area and license agreements and prints of said feature motion picture shall be made available by the distributor to those subsequent run theatres that would normally be served on subsequent run availability.

This part of the statute was inartfully drafted,[17] and distributors interpret its requirements differently. Some read it to mean that no theatre may play a film for longer than 42 days. There is no support for such an interpretation, however. The clause prohibits contracts which grant an exhibitor an exclusive run in an area for more than 42 days. There is nothing in the law that prevents a distributor and exhibitor from agreeing to a run of more than six weeks as long as the license provides for expansion on the 43rd day. There is nothing in the law which prevents a distributor from contracting with an exhibitor for an exclusive run of six weeks and then, after bidding or negotiation, contracting for another exclusive engagement with the same theatre owner.

Plaintiffs contend that some films have opened late in Pennsylvania because of the 42-day clause. Distributors release films which are likely to start slowly at the box office and then build in popularity on what is called a "platform" release strategy. These films open initially in a handful of theatres in a few big cities and rely on word-of-mouth to gain audience size. Distributors nurture these films slowly and do not release them broadly until they have attained a certain level of popularity. The plaintiffs contend that the 42-day clause prevents them from maintaining control over this type of slow release and that, as a result, they have chosen not to open some films in Philadelphia at the early states of platform release. The Act, however, does not cause such a delay. At most, it is a minor factor in a marketing decision exclusively within the control of the distributor. It is the distributors' strategic choice, not the Act, which may delay release. In addition, this problem affects so few pictures that its impact is minimal.[18]

Plaintiffs' next complaint is that as a result of the 42 day clause exhibitors are less likely to offer high rental terms on certain films because the distributors cannot guarantee an exclusive run of longer than six weeks. Such complaints are not supported by any credible evidence in the record. It is more likely that the clause will increase film rental for those films that are blockbusters or which turn out to be more popular than expected. When such films are reoffered after 42 days, they will probably garner higher percentage rental terms for the first weeks of the new license

---

**16.** Plaintiffs have made some farfetched claims about the evils of prohibiting guarantees and advances. Their proposed Findings of Fact complain that these provisions "may reduce the amount of internal capital available for other films and may, over the long run, reduce the distributors' willingness and ability to finance films without a built-in market." Plaintiffs, before trial, abandoned their claim that the Act affects financing for films and presented no evidence on this issue. The distributors have also contended that an exhibitor who has paid a substantial guarantee for a film will promote the film more vigorously than one who licenses a film without a guarantee term. This position is not supported by the evidence.

**17.** For instance, the statute leaves the definition of a "geographical area" unclear. It is not necessary for me to resolve these ambiguities.

**18.** One picture which allegedly opened late in Philadelphia because of the 42 day clause was "THE KILLING FIELDS." The film opened for an exclusive run in Boston in December and opened in Philadelphia on January 18. The movie, however, opened in Washington, D.C., an unregulated jurisdiction, on the same day that it opened in Philadelphia and in both Boston and Philadelphia the picture was more broadly released on February 1.

than they would for the seventh and succeeding weeks, of the original agreement.[19]

The 42 day clause also has benefits for the Pennsylvania moviegoer. The purpose of the provision is to promote the wider dissemination of films in the Commonwealth. The evidence showed that the Act has achieved that purpose. Some films have opened in suburban and rural areas more quickly since the Act took into effect. Indeed, some have done so on exactly the 43rd day after the initial area release.

### D. *Regulation of Bidding Procedures*

The open bidding provision of the Act and the provision requiring re-bidding when the distributor rejects all bids serve a useful function by preventing certain unfair licensing practices. Before the Act, some distributors frequently gave favored exhibitors secret glances at competitors' bids, called "5 o'clock looks." Collusion between favorites often controlled the bidding for pictures. The open bidding and re-bidding requirements eliminate the 5 o'clock look, place all exhibitors on equal footing, and remove the bidding process from the dark. The distributors argue that open bidding encourages collusion among exhibitors. They admit that "documented examples of such abuse have been sparse." In fact, documented examples of such abuse are non-existent.

Plaintiffs also contend that because open bidding allows exhibitors to compare bids, they ultimately receive less favorable terms on film licenses. There is no evidence that this has occurred.[20] It seems equally likely that an exhibitor will bid

higher terms after seeing his competition's bids.[21]

Plaintiffs next complain that distributors often prefer to accept low bids rather than submit to the time-consuming rebidding process. Rebidding, however, can take place almost instantaneously. The Act permits oral bid solicitation and oral bids. The plaintiffs have not made a credible showing that this has been a problem of any significance.

Finally, the distributors allege that the Act's regulation of bidding procedures is so onerous that it has forced some distributors to license all films in Pennsylvania by negotiation, which usually results in lower film rentals. The problem with this argument is that while some distributors have switched to negotiation, others bid just as frequently and others use bidding more frequently. Those distributors who switched to negotiation have done so as a business judgment. The Act leaves open to the choice of distributors whether to license by bidding or negotiation. There is no credible evidence that the Act has caused any distributor to stop licensing pictures by bidding.[22]

### E. *Plaintiffs' and Defendants' Statistical Claims*

Both parties to this lawsuit have presented statistical evidence relating to the burdens imposed by the Pennsylvania Act.

Plaintiffs' study was far more ambitious than defendants. They collected information on every new film license issued by

19. Administrative expense caused by having to reoffer a film after six weeks is minimal.

20. In fact, the evidence indicated that those distributors who have adhered most closely to the open bidding provision have received higher film rental percentages since the act.

21. The plaintiffs complain that the Act allows the exhibitor who submits a bid stating only that he is "willing to negotiate" to learn about the competition's bidding practices. This position is based on a misreading of the statute. Under § 203–3 a bid "states the terms under which the exhibitor will agree to exhibit a feature motion picture." The exhibitor who is

merely "willing to negotiate" has not submitted a bid and is not entitled to examine competitors' bids.

22. Plaintiffs argue that those distributors who continue to bid may be able to "hold their percentage rental figures up, but may, ... be licensing fewer runs than sought or accepting offers from sub-run theatres." First, the record does not support this contention. Second, the premise behind plaintiffs' statistical study is that distributors try to maximize their film rental percentages. The argument they make here undercuts this premise by acknowledging that percentage rentals are not necessarily the bottom line for distributors.

plaintiffs in six metropolitan areas: Philadelphia, Pittsburgh, Reading/Lancaster, Scranton/Wilkes-Barre, Harrisburg and Erie. Plaintiffs selected January 1, 1977 as the starting date and June 30, 1983 as the termination date of the study. In all, the study included approximately 14,000 licenses. Of the six and one-half year period covered by the study, the Pennsylvania statute was only in effect for two and one half years. The period between the granting of summary judgment in *AFD* I and the Court of Appeals mandate reversing and remanding that decision were counted with the time before the Act took effect as the "unregulated" periods. More than twice as many licenses were issued in these times as in the regulated periods.

Plaintiffs' study demonstrates that the distributors' film rental percentage in unregulated periods was 55% and in regulated periods was 51%. Film rental percentage is that percentage of the exhibitor's box office gross paid to the distributor as rental. Plaintiffs allege that the decline in percentage rental demonstrates significant burden caused by the Pennsylvania statute. One problem with this conclusion is that it assumes that percentage film rental is a meaningful term. The evidence suggests that percentage rental is a statistic with only marginal significance. Like other businesses, the motion picture industry looks to its dollar receipts and its bottom line to measure results. Percentage rental may have little relation to the bottom line. Plaintiffs themselves offered a great deal of testimony about differences among movie theatres. Distributors do their best to license their films to prime theatres. A distributor may not be able to license a picture to a prime theatre on terms as favorable as it can to a less attractive or spacious facility, but the film may earn more dollars at the former. In addition, there was evidence that some distributors substantially reduce contract terms in licenses with certain exhibitors by renegotiating after the run. Reductions occur even when films are licensed by bid, where traditionally terms are held firm, and even when the film has been successful. That these reductions occur indicates that distributors do not always act to maximize percentage rental.

Another basic fallacy is plaintiff's reasoning that because distributors' share of film rental declined during the periods of regulation, the Pennsylvania Act caused the reduction. In fact, the causal connection does not appear to exist. When one examines the fortunes of each of the plaintiffs individually, it becomes extremely difficult to blame the Act for an overall decline in percentage rental. Some distributors have fared better during regulated periods than during unregulated periods. The decline of other distributors' percentage rental is more persuasively explained by factors other than the Act, such as the presence or absence of one blockbuster, or general decline in a company's fortunes.

Plaintiffs' study also fails to provide any information about the Act's effect on certain segments of the industry. Because the study was limited to films licensed by the plaintiffs, it does not show what effect, if any, the statute has on independent distributors. Furthermore, because the study was limited to six large areas, it provides no information about the effect of the statute on small towns. Plaintiffs' economics expert, in fact, testified that the study would have produced more accurate results had it been a random survey of 55% of the entire state, rather than an examination of certain metropolitan areas comprising 55% of the state's population.

Plaintiffs' expert also conducted a regression analysis to demonstrate the effect of the statute on percentage film rental. When the number of licenses on a particular film, the length of run, and the relative success of the film were held constant, the analysis showed that the presence of regulation correlated with a 2.9% decline in percentage film rental. As with plaintiffs' statistical study, the regression analysis was founded on the assumption that distributors attempt to maximize percentage film rental. Moreover, when one makes the assumption, which I find warranted, that the presence of regulation has not

caused any distributor to switch from bidding to negotiation or to renegotiate license terms downward after the run, the regression analysis shows that any effect of regulation on percentage rental is, at most, incidental.[23]

There is no credible evidence that the Act causes a switch to either negotiation or renegotiation of licenses. Certainly on its face the Act does not mandate such procedures. In addition, there is no real evidence that the Act has indirectly had such an effect on the way distributors do business. Some of the distributors license more pictures by bid now than they did before the Act became effective. The decisions by other distributors to negotiate exclusively, to engage in competitive negotiation or to discount some licenses are business decisions unrelated to the Pennsylvania Act.

Defendants' statistical claim that some exhibitors in Pennsylvania paid higher percentage film rental to all distributors after the Act than before is also flawed. The base of data for this claim includes both first run and subsequent run films, and thus fails to isolate the Act's primary impact on first run movies. The claim is also weakened by the fact that it treats as occurrences during a "regulated period" data from the period of about a year during which at least some distributors relied on the subsequently reversed ruling in *AFD* I that the Act was unconstitutional. More persuasive is evidence that indicates distributors did not receive higher percentage film rental in unregulated states than in regulated jurisdictions and evidence showing that regulation has had no real impact on plaintiffs' market share in Pennsylvania as a percentage of nationwide film rental. Such evidence suggests that differences in percentage film rental, if significant at all as a measure, do not depend on whether the distributor is subject to the kind of trade practice regulation contained in the Pennsylvania Act.

## V. *Commerce Clause*

■ Plaintiff claims that the Pennsylvania Feature Motion Picture Fair Business Practices Law violates the Commerce Clause of the United States Constitution. Article 1 § 8, Clause 3. Even in the absence of federal legislation, the Commerce Clause places some limits on state regulation. *Cooley v. Board of Wardens of the Port of Philadelphia*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851). The plaintiff distributors contend that the law discriminates against and unconstitutionally burdens interstate commerce.

■ A state law whose purpose or effect is to discriminate against interstate commerce constitutes simple economic protectionism and is virtually invalid *per se*. *See Bacchus Imports Ltd. v. Dias*, — U.S. —, —, 104 S.Ct. 3049, 3054, 82 L.Ed.2d 200 (1984); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981). The Supreme Court's definition of what constitutes a discriminatory law is narrow. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), involved a Maryland law which, in part, forced all producers and refiners of petroleum products to divest themselves of retail service stations in the state. The brunt of the statute fell completely on out-of-state companies because there were no local producers or refiners. The Court held that the statute was not discriminatory. First, it did not discriminate against out-of-state producers and refiners because there were no producers or refiners in Maryland to favor. Second, the Court rejected appellant's claim that the statute discriminated by protecting in-state independent dealers from out-of-state competition:

[I]n-state independent dealers will have no competitive advantage over out-of-state dealers. The fact that the burden of a state regulation falls on some interstate companies does not, by itself, estab-

---

**23.** When negotiation and renegotiation are factored out, the presence of regulation results in a decline in percentage rental of .94%.

lish a claim of discrimination against interstate commerce.

437 U.S. at 126, 98 S.Ct. at 2214.

The Court also held:

If the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market ... the regulation may have a discriminatory effect on interstate commerce. But the Maryland statute has no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the interstate flow of goods.

427 U.S. at 126, n. 16, 98 S.Ct. at 2214, n. 16.

■ The Pennsylvania statute at issue in this case is facially neutral. *Exxon* indicates that even if there were no Pennsylvania distributors the law would not be considered economic protectionism because it draws no distinction between in-state and out-of-state distributors. In fact, there was testimony at trial that two independent distributors, albeit small ones, are located in this Commonwealth. Just as their out-of-state competitors, these local distributors must follow all the requirements of the Feature Motion Picture Fair Business Practices Law. The Pennsylvania statute does not discriminate against interstate commerce.[24]

■ Even a law which does not discriminate may be struck down if it unduly burdens interstate commerce. The applicable test was announced in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

Pennsylvania's Act regulating the licensing of motion pictures satisfies the *Pike* test.

Again, *Exxon* provides a useful comparison. There was evidence that the three refiners who marketed their product in Maryland solely through company-operated stations might withdraw from selling in Maryland completely if the statute in question were enforced. There was no evidence, however, that the statute would affect the total quantity of petroleum products shipped into Maryland. In finding that the statute imposed a permissible burden on interstate commerce, the Court stated:

The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.

437 U.S. at 127, 98 S.Ct. at 2214.

Appellants in *Exxon* also claimed that the Maryland statute would burden interstate commerce by changing the market structure in the petroleum industry. The Court also rejected that claim.

**24.** The Sixth Circuit held that Ohio's trade screening and movie regulation statute was not discriminatory under the Commerce Clause because of its facial neutrality. *Allied Artists Picture Corp. v. Rhodes,* 679 F.2d 656, 662 (6th Cir.1982) (hereinafter *Allied* II). Also instructive is the Fourth Circuit's decision in *American Motors Sales Corp. v. Division of Motor Vehicles of the Commonwealth of Virginia,* 592 F.2d 219 (4th Cir.1979). That case involved a Virginia

statute which restricted the ability of automobile manufacturers or distributors to grant additional franchises for a particular line of vehicle in a trade area already served by one or more dealers carrying the same line. The Fourth Circuit held that because the statute drew no distinction between manufacturers within the state and those outside, it did not discriminate against interstate commerce.

We cannot ... accept appellant's underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market.... [T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations. It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce. 437 U.S. at 127–28, 98 S.Ct. at 2214–15.

There is no credible evidence that the Pennsylvania statute at issue in this case has caused any diminution in the amount of film product flowing into the state. The evidence fails also to support plaintiff's argument that the Act has delayed the introduction of some films into Pennsylvania. The benefits from the act are substantial and outweigh the minimal burdens created by the legislation.

The prohibition against trade screening serves the primary goal of reducing the risks of deceptive licensing practices by distributors. Such a goal protects not only theatre owners in the Commonwealth, but also the public. The anti-blind bidding provision facilitates exhibitors' ability to provide communities with the films they will more likely want to see. It encourages exhibitors to license films based on the merits of the product.

█ The burdens imposed by the trade screening requirement are minimal by comparison. There is no constitutional right to sell a pig in a poke. The financial costs of producing a trade screening print are small in comparison with the distributors' filming budgets. The trade screening requirement has not affected the quality of films, nor has it delayed their release. That a distributor may not have its picture ready in time to license it at a prime theatre is not a result of the Act. Another distributor, one who is able to produce a trade screening print more promptly, will win the theatre. As the Court made clear in *Exxon*, the Commerce Clause protects the interstate market, not particular firms.[25]

The prohibition of guarantees and advances serves the primary purpose of preventing large exhibitors from using their deep pockets to squeeze smaller exhibitors out of the market. This benefits both small theatre owners and the public, which gains by having a greater available choice of theatres and films.[26] The interests served by these clauses are legitimate ones. In *Pike*, the Court recognized a State's legitimate interest in "maximizing the financial return to an industry within it." 397 U.S. at 143, 90 S.Ct. at 848. *See also Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Later, in *New Motor Vehicle Board v. Orrin W. Fox, Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), the Supreme Court upheld a California statute which regulated the granting of automobile franchises. Although that decision was based on the due process clause, the Court did identify "the promotion of fair dealing and the protection of small business" as valid state interests. 439 U.S. at 102, n. 7. Relying in part on this language, the Fourth Circuit held that a similar Virginia statute did not unduly burden interstate commerce. *American Motors Sales Corp. v. Division of*

---

**25.** *Some mention was made during trial of the practice of licensing films by blind bidding, but with a "48 hour cancellation clause." Such clauses allows exhibitors to cancel their licenses within 48 hours after actually viewing the film. Requiring the use of these clauses would not serve the public interest as successfully as the trade screening requirement. By the time the exhibitor actually sees the picture, it is generally too close to the exhibition date to license another film.*

**26.** There are some secondary benefits to the prohibition of guarantees and advances as well. The public benefits because exhibitors are less likely to stretch out the run of a film to try to recoup a guarantee. The prohibition also may help keep film prices in the Commonwealth stable.

*Motor Vehicles of the Commonwealth of Virginia,* 592 F.2d 219 (4th Cir.1979).[27]

The burden imposed by the prohibition of guarantees and advances is not excessive in relation to the local benefits derived from the prohibition. Plaintiffs' own economics expert testified that the amount of unearned guarantee income was not substantial enough to affect film rental. In addition, advances are not the only effective means of dealing with slow payers or poor credit risks.

A provision merely prohibiting the solicitation of guarantees and advances, such as that in Ohio, does not serve the public interest as successfully as Pennsylvania's provision. Barring solicitation by distributors would not prevent large exhibitors from using guarantees to obtain films which might otherwise be licensed to small theatre owners.

The 42 Day provision also passes the *Pike* test. There is a legitimate and substantial benefit in promoting the faster dissemination of new films in rural and suburban areas. Once the distributors' misinterpretations of the provision are discounted, the burdens imposed by the clause are minimal. That a distributor may elect not to open a film in Pennsylvania on a given day because of the 42 day clause is a decision of marketing strategy, not an effect of the Act. The Commerce Clause does not protect the "methods of operation in a retail market," *Exxon,* 437 U.S. at 127, 98 S.Ct. at 2215, nor does it guarantee to distributors freedom from any regulation that might marginally influence their business strategy.

The Pennsylvania Act's provisions regulating bidding procedures also pass muster under the test announced in *Pike.* The open bidding and re-bidding requirements of the Act provide a substantial benefit to the public interest by discouraging deception by distributors and collusion between distributors and exhibitors and by encouraging honest bidding practices. The burdens imposed by these sections of the Act are minor. There was no credible evidence that the bidding procedure regulations caused any delay in the release of films or anything more than minor administrative expense.

■ The plaintiff's contention that the Pennsylvania Act reduced distributors' film rental does not change the balance under the *Pike* test. Cost is a factor to be taken into account when assessing burden in a Commerce Clause analysis. *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 445 n. 21, 98 S.Ct. 787, 796 n. 21, 54 L.Ed.2d 664 (1978). Percentage film rental, however, is a term without any real meaning. Even if it did have significance, the Act is not the cause of declining percentage film rental.

Plaintiffs argue that the Act has caused some distributors to switch from bidding to negotiation and that, as a result, percentage film rental has declined. The decisions to negotiate or to renegotiate are, however, based on business judgment and are not caused by the Pennsylvania Act. In addition, when negotiation and renegotiation are held constant, plaintiff's regression analysis demonstrated only a .91% decline in percentage film rental during periods of regulation.

**27.** In *Allied II* the Sixth Circuit remanded the issue of the validity of Ohio's regulation of guarantees and advances. District Court Judge Duncan had found that the regulation primarily acted to correct a bargaining imbalance between exhibitors and distributors. *Allied Artists Pictures Corp. v. Rhodes,* 496 F.Supp. 408 (S.D. Ohio 1980) (hereinafter *Allied* I). The Court of Appeals, relying on *Baldwin v. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), concluded that "a state's interest in righting a bargaining imbalance, standing alone, is not sufficient under the Commerce Clause to permit direct interference with pricing where it bur-

dens interstate commerce." 679 F.2d at 665. The Court remanded for a determination of whether any other legitimate local public interest existed. I do not base my decision on a bargaining imbalance between local exhibitors and out-of-state distributors. I base it instead on the state's clearly legitimate interest in maintaining the vitality of its small theatre owners and in protecting them from being engulfed by powerful exhibitors, both local and national. Moreover, I read *Baldwin v. Seelig, Inc.* to reject a New York law which on its face amounted to economic protectionism.

The Pennsylvania Feature Motion Picture Fair Business Practices Law serves legitimate and substantial public purposes. The Act takes a small step against dishonest and unfair practices in the motion picture industry. A legislature

need not strike at all evils at the same time or in the same way.... [I]t may implement its program step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.

*Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981) (citations omitted).

In contrast to its benefits, the burdens imposed by the Pennsylvania Act are incidental and are not "clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847.

VI. *The First and Fourteenth Amendments*

■ The Pennsylvania Feature Motion Picture Fair Business Practices Law does not violate the First and the Fourteenth Amendments to the United States Constitution. In its opinion reversing *AFD* I, the Court of Appeals stated the test by which this Court must evaluate the statute. *Associated Film Distribution Corp. v. Thornburgh,* 683 F.2d 808, 813 (3d Cir. 1982). Although motion pictures are protected by the First Amendment, *Interstate Circuit v. Dallas,* 390 U.S. 676, 682, 88 S.Ct. 1298, 1302, 20 L.Ed.2d 225 (1968), the Court held that the Pennsylvania Act is content-neutral trade practice legislation. As such, the applicable test is that set forth in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, *rehearing denied,* 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968):

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government, if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

The Court of Appeals remanded this case for a factual determination of the Act's actual threat to First Amendment values, the nature and weight of the state's interests in enacting the law and a balancing of the state's concerns against the impact on the First Amendment.

In fact, the Pennsylvania Act has had little or no impact on First Amendment values. There was no credible evidence that the Act has had or will have any effect on the quality or number of films being produced or being exhibited in the Commonwealth of Pennsylvania. There was also no evidence that the Act has caused a material delay in the exhibition of films in the Commonwealth. No evidence was offered which suggested that more films miss their release dates now than before the Act. The trade screening requirement, when combined with production delays, creates a minimal risk of delayed release. Distributors, however, accelerate post-production and have missed release dates in only a handful of cases. Even in these instances, it is not proven that the Act caused the delay. Plaintiffs claim that some distributors have chosen not to release certain films at an early date in Pennsylvania because of the 42-day clause. Although it may marginally influence a distributor's marketing decision, the clause does not compel the distributor to make such a decision.

The concerns which led the Commonwealth to enact the Act are substantial. The Act promotes fair dealing between distributors and exhibitors, helps preserve the viability of small exhibitors and promotes wider dissemination of films at diverse locations and at reasonable prices. The statute, in fact, advances some of the interests underlying the First Amendment. The trade screening requirement encourages innovation by making it more likely that films will be licensed on merit rather than on the name of their producer, director or star. The abolition of guarantees and advances promotes competition among exhibi-

tors, and promotes the exhibition of a variety of films at many locations. The 42 day provision makes it easier for people living outside cities to see films more quickly.

On balance, the Feature Motion Picture Fair Business Practices Law satisfies the *O'Brien* standard. It was within the constitutional power of the state to enact the law.[28] The legislation furthers a substantial state interest which is content-neutral and, therefore, unrelated to the suppression of free expression. The impact of this law on First Amendment freedoms in *de minimis* and, in any event, is outweighed by the interests of the state in passing the statute.[29]

### VII. *Copyright Preemption*

Plaintiffs' third claim is that the Federal Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Supremacy Clause of Article VI of the United States Constitution preempt the Pennsylvania statute. The district judge's original opinion in *AFD* I ruled that on its face the Pennsylvania Act was preempted by the copyright laws. 520 F.Supp. at 995. The Court of Appeals reversed and remanded for a determination of whether "the prohibitions contained in the Pennsylvania Act *in fact* stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.... The question of whether and to what extent the Pennsylvania Act interferes with attaining the 'purposes and ob-

jectives of Congress' is one which must be resolved before the trial court can decide, as a matter of law, whether the interference (if any) is such as to require invalidation of all or part of the Pennsylvania Act on preemption grounds." 683 F.2d at 816.

The Supreme Court has held recently that preemption of a state law will occur:

[f]irst, when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law ...; second, when it is clear, despite the absence of explicit pre-emptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation ...; and, finally, when compliance with both state and federal law is impossible ... or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Capital Cities Cable, Inc. v. Crisp,* ── U.S. ──, ── ──, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580, 588–89 (1984) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

Plaintiffs claim that the Pennsylvania Act fails to pass muster under the first and third tests.

▪ For its argument that the Act violates the first test, plaintiffs rely on 17 U.S.C. § 301, which states:

---

**28.** I will discuss the validity of the statute under the Pennsylvania Constitution in a later portion of this opinion.

**29.** *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), was decided after the Third Circuit's opinion in *AFD* II and the Sixth Circuit's opinion in *Allied* II. In that case, a newspaper challenged a Minnesota statute which imposed a use tax on ink and paper. The tax exempted the first $100,000 spent by a publication on ink and paper in any calendar year. The Court stated that "differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.... Differential taxation of the press, then, places such a burden on the interests protected by the First Amendment that

we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." 460 U.S. at 585, 103 S.Ct. at 1372. The decision in *Minneapolis Star* is distinguishable. Pennsylvania has not imposed a tax on distributors. It is not proven that the legislation in the present case has had *any* impact on profits. Moreover, the differential treatment of the movie industry in Pennsylvania's laws is justified by the special problems of that industry. The Commonwealth's attempt to remedy these specific evils is not related to the suppression of free expression and is warranted by the state's interest in reforming the licensing process. Finally, the decision in *Minneapolis Star* rested, in part, on the fact that the Minnesota statute was not content-neutral in that its burden rested solely on large periodicals.

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright ... whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

. . . . .

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. § 106 provides that the owner of a copyright has the exclusive right to do any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies of phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of ... motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

The narrow question is whether the state statute grants any rights equivalent to the exclusive rights given to copyright owners. As the Court of Appeals stated in *AFD* II,

"the Act does not take away from plaintiffs and give to another the right to reproduce the film, to prepare derivative works based on the film, to distribute the film, or to license its performance." 683 F.2d at 816. The statute does not create any rights equivalent to those enumerated in § 106 on its face or in practice.

The purpose of § 301 was not to invalidate state trade practice legislation, but to eliminate the former system in which federal copyright law controlled published works and state law unpublished works.

Instead of a dual system of "common law copyright" for unpublished works and statutory copyright for published works ... the bill adopts a single system of Federal statutory copyright from creation.... Common law copyright protection for works coming within the scope of the statute would be abrogated....

Notes of the Committee on the Judiciary, House Report No. 94–1476, 94th Cong., 2d Sess. (1976) (reprinted at pp. 271–72 of 17 U.S.C.A. (1977)).

As Professor Nimmer explains, § 106 identifies those rights which are within "the general scope of copyright." The copyright owner's right is the exclusive right "to prohibit reproduction, ... performance, distribution or display" of the copyrighted work. 1 *Nimmer On Copyright*, § 1.01[B] at 1–11, 1–12.

Thus, in essence a right which is "equivalent to copyright" is one which is infringed by the mere act of reproduction, performance, distribution or display.... If under state law the act of reproduction, performance, distribution or display, no matter whether the law includes all such acts or only some, will *in itself* infringe the state created right, then such right is pre-empted. But if other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, then the right does not lie "within the general

scope of copyright," and there is no pre-emption.

*id.*[30]

Acts other than the acts of reproduction, performance, distribution or display are necessary elements of violations under the Pennsylvania statute.[31] The Act does not create any rights equivalent to those guaranteed to the copyright owner and is not pre-empted by 17 U.S.C. § 301.

■ I turn now to plaintiffs' contention that the Act is pre-empted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). The Court of Appeals in *AFD* II remanded because *on its face* the Act did not interfere with the purposes and objectives of the copyright laws. After full trial on the merits, this Court concludes that the Act does not stand as an obstacle to the federal copyright system in practice. As the Court stated in *Mariniello v. Shell Oil Company,* 511 F.2d 853, 857–58 (3d Cir.1975):

> In recent times, the Supreme Court has employed the Supremacy clause sparingly to strike down state law.... Where conflict is alleged between federal and state law, the specific purpose of the federal act must be ascertained in order to assess any potential erosion of the federal plan by operation of the state law.

Article I, § 8 of the United States Constitution, which confers on Congress the power to legislate in the field of copyright, explicitly declares that the purpose of copyright is "[t]o promote the Progress of Science and useful Arts, by securing for limit-ed Times to Authors and Inventors the exclusive right to their respective Writings and Discoveries." The Copyright Act is "based on the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors," *AFD* II, 683 F.2d at 815 (quoting *Allied I,* 496 F.Supp. at 446); however, "[t]he copyright law, like the patent statutes, makes reward to the owner a secondary consideration." *AFD* II, 683 F.2d at 815 (quoting *United States v. Paramount Pictures, Inc.,* 334 U.S. at 158, 68 S.Ct. at 929).

In remanding this case, the Court of Appeals explicitly adopted the framework of analysis set forth by Judge Duncan in *Allied* I:

> The Supreme Court has rejected the notion that because "a copyright is property derived from a grant by the United States," it is not subject to state regulation of the manner in which its product is marketed. *Fox Film Corp. v. Doyal,* 286 U.S. 123, 128, 52 S.Ct. 546, 547, 76 L.Ed. 1010 (1932). Further, the Supreme Court has rejected claims that the exclusive right granted by Congress to distribute copyrighted material included the exclusive right to distribute it in the manner deemed most desirable by the copyright holder. *Watson v. Buck,* 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).
>
> In *Fox Film, supra,* the Supreme Court upheld a state's direct taking by imposition of a tax of royalties derived from federal copyrights. Scarcely a more blatant, effective method of reducing the author's award can be imagined. Yet the Court stated:

---

**30.** § 301(b) of the Copyright Act, as originally drafted stated:

> Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any state with respect to—
>
> (3) activities violating rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106, including breaches of contract, breaches of trust, invasion of privacy, defamation, and deceptive trade practices such as passing off and false representation.

§ 301(b)(3), H.R. 4347, 89th Cong., 2d Sess. (1966). The elimination of the illustrative clause in § 301(b)(3) was not intended as a substantive change in the meaning of the provision. 1 *Nimmer on Copyright,* § 1.01[B] at 1–14.3.

**31.** In the Ohio litigation, Judge Duncan used this framework to find that the Ohio statute was not pre-empted by the federal copyright act. *Allied* I, 496 F.Supp. at 407–08.

The statute confers upon the author after publication the exclusive right for a limited period to multiply and vend copies and to engage in the other activities described by the statute in relation to the subject matter, U.S.C., Tit. 17. In creating this right, the Congress did not reserve to the United States any interest in the production itself, or in the copyright, or in the profits that may be derived from its use. Nor did the Congress provide that the right, or the gains from its exercise, would be free of tax. The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property. The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.

\* \* \* \* \* \*

... The nature and purpose of copyrights place them in a distinct category and we are unable to find any basis for the supposition that a nondiscriminatory tax on royalties hampers in the slightest degree the execution of the policy of the copyright statute.

*Fox Film, supra,* 286 U.S. at 127, 131, 52 S.Ct. at 548 (citations omitted).

The authority of the states to regulate market practices dealing with copyrighted subject matter is well-established. Thus, for example, the Supreme Court has made it clear that the existence of a copyright does not permit its owner to contract concerning it in ways that suppress competition in violation of federal antitrust laws. 15 U.S.C. § 1, *et seq. Interstate Circuit v. United States,* 306 U.S. 208, 230, 59 S.Ct. 467, 476, 83 L.Ed. 610 (1939). Similarly, ownership of a copyright does not entitle a company to abuse the market power it obtains thereby by engaging in a *per se* illegal tying arrangement, *see e.g., United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 156–57, 68 S.Ct. 915, 928–29, 92 L.Ed.

1260 (1948), price fixing, *see, e.g., Watson v. Buck,* 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941), or other fraudulent or deceptive practices, *cf. Mariniello v. Shell Oil Co.,* 511 F.2d 853 (3d Cir.1975); *Hearing Aid Ass'n. of Kentucky, Inc. v. Bullock,* 413 F.Supp. 1032 (E.D.Ky.1976).

The State of Ohio is no more interfering with the legitimate rights of owners of copyrighted motion pictures by regulating the ways in which plaintiffs and other producer-distributors license their product in order to achieve fair and open bargaining than were the states in passing the legislation upheld in those cases.

*AFD* II, 683 F.2d at 815–16, (quoting *Allied* I, 496 F.Supp. at 446–47).

The Courts of Appeals for the Third and Sixth Circuits, in considering this issue, have stated:

we do not find authority for the argument that state trade regulation which affects distribution procedures and, indirectly, monetary returns from copyrighted property is invalidated implicity or explicity by the terms of the Copyright Act ... or the copyright clause [of the United States Constitution].

*AFD* II, 683 F.2d at 816 (quoting *Allied* II, 679 F.2d at 661–63).

The question for this court is "whether the Pennsylvania Act in fact precludes the 'accomplishment and execution of the full purposes and objectives' of the Copyright Act." *AFD* II, 683 F.2d at 817.

Plaintiffs have not fulfilled their burden of demonstrating that the Pennsylvania Feature Motion Picture Fair Business Practices Law has interfered with the Federal Copyright Act. The evidence produced at trial showed that the Pennsylvania Act has had no effect on the incentive to make and distribute motion pictures. There was no evidence that fewer motion pictures are being made today or that the quality of pictures has declined. The Copyright Act does not guarantee an author maximum profit and, in any event, it is not proven that the Pennsylvania Act has reduced the distributors' reward.

The Pennsylvania statute does not dilute the distributors' ownership rights in their films. They maintain exclusive control over the decision whether to license as well as when to license and to whom to license. The Pennsylvania Act may change the way distributors do business. It does not, however, take from them the essential rights of ownership.

Plaintiffs argue that the statute interferes with the copyright owner's exclusive right "to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 106(3). This argument is misplaced. The Pennsylvania Act sets no limit on the financial terms at which films may be licensed. The Act in no respect prevents a distributor from selling a film to a theatre owner outright, nor does it interfere with the distributor's ability to license a film to an exhibitor. The Act does not prevent the distributor from assuring itself of a fixed amount of remuneration for a license. Distributors may still license films for fixed sums. The prohibition of guarantees means that the distributor cannot have it both ways where there are adverse consequences; it cannot license a film on a percentage rental basis and at the same time receive a guaranteed minimum payment.

The invalidation of advances does not restrict the distributors' right to license its films. The Copyright Act does not assure security for the copyright owner. An exclusive ownership right is not equivalent to a right to license without risk.

Plaintiffs have also contended that inherent in the exclusive right to distribute is the right to offer a film at the time which the copyright owner considers most advantageous. Plaintiffs' argument is that the Pennsylvania Act imposes a direct control on the timing of licensing by preconditioning it on trade screening. The evidence presented at trial, however, showed that the Act has not impaired distributors' ability to release their films on the dates they desire. Although it is true that the statute prevents distributors from contracting until a trade screening print is available, this has little effect on the essential rights of the copyright owner:

> There is nothing in the federal Copyright Act prohibiting the state from exercising its police powers to rectify a market situation it perceives as inequitable. The comment by the Supreme Court regarding the practice of block booking in *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 158 [68 S.Ct. 915, 929, 92 L.Ed. 1260] ... is apropos:
>
> > It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius. But the reward does not serve its public purpose if it is not related to the quality of the copyright.... The [prohibited] practice tends to equalize rather than differentiate the reward for the individual copyrights.

*Allied* I, 496 F.Supp. at 447.

Blind bidding forces exhibitors to license on the basis of inadequate and misleading information. It rewards hype, not artistic merit. The right to sell in this manner is not related to the quality of the copyright.

Plaintiffs have also argued that the trade screening provision deprives copyright holders of their ownership rights by requiring them to display their product when they would not ordinarily wish to do so. As Judge Duncan noted in *Allied* I, the trade screening requirement does not impede the copyright owner's right to *prohibit* display or distribution. The distributor must only trade screen if it decides to license in Pennsylvania. *Allied* I, 496 F.Supp. at 447. The trade screening requirement does not interfere with the purposes of the Copyright Act.

The plaintiffs' next contention is that the Pennsylvania Act's 42 day clause interferes with the copyright owner's right to license exclusively for the life of the copyright. After hearing the evidence in this case and after discounting the distributors' misinterpretations of the statute, the Court concludes that the 42 day provision's interference with the exclusive rights of the copyright owner is minimal. The statute does not prevent distributors from contracting for runs of longer than six weeks. It

merely says that if such a contract is made, it must contain some provision for expanding the run within the geographical area after the forty-second day. The statute also does not prevent a distributor from entering into a series of exclusive licenses with one exhibitor as long as each license does not exceed 42 days. The facts produced at trial failed to show that the 42 day clause has in any respect dampened incentive in the motion picture industry, nor has it interfered with the purpose or execution of the Copyright Act.

In fact, the 42 day clause and the Pennsylvania statute as a whole promote the purposes underlying the Copyright Act. The Act improves the public's access to creative products. The 42 day clause benefits the public by quickening the wide dissemination of creative works. Similarly, the prohibition of guarantees and advances helps maintain the viability of small exhibitors, increasing the public's choice of theatres and films. Finally, the trade screening requirement allows exhibitors to differentiate pictures on the basis of factors relating to merit and, therefore, may afford independent, lesser known distributors a better chance to display their wares.

## VIII. *Pennsylvania Constitution*

■ Plaintiffs' final claim is that the Pennsylvania Feature Motion Picture Fair Business Practices Law violates Article III, Section 32 of the Pennsylvania Constitution, which is the Commonwealth's version of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. It provides:

The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:

1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts:

.    .    .    .    .

7. Regulating labor, trade, mining or manufacturing. . . .

The Pennsylvania Act does not violate Section 32. First, the act does not constitute a "special law." In *Commonwealth v. Webb*, 1 Pa.Cmwlth. 151, 162, 274 A.2d 261, 267 (1971), the Commonwealth Court held:

[i]n the exercise of the police power, and in the interest and for the protection of the public, the state may, without denial of the equal protection of the laws, reasonably regulate a business, a useful trade, occupation, or profession which may prove injurious to the public, just so the legislation is not discriminatory in the sense of applying unequally to persons pursuing or engaged in the same calling, profession, or business under the same or like conditions and circumstances.

The Pennsylvania legislation at issue in this case benefits the public interest and is a valid and reasonable exercise of the police power.[32] While the Act distinguishes the motion picture industry from other trades, it applies equally to persons and firms within that business. The Act, therefore, constitutes a general law not subject to the provisions of Article III, Section 32 of the Pennsylvania Constitution. *Kroger Co. v. O'Hara Township*, 481 Pa. 101, 392 A.2d 266 (1978) is not to the contrary. In *Kroger*, the Pennsylvania Supreme Court held unconstitutional Pennsylvania's Sunday Trading Laws, known also as blue laws. The Pennsylvania blue laws represented exactly that type of special legislation § 32 was meant to combat:

[W]hen a law which prohibits business activity is riddled with exception after exception, a time comes when the general scheme is so diluted that it violates the equal protection of the laws.

481 Pa. at 116, 392 A.2d at 273.

Even if the Pennsylvania statute is considered a "special law," it passes muster

---

**32.** Plaintiffs rely heavily on *Hertz Drivurself Stations, Inc. v. Siggins*, 359 Pa. 25, 58 A.2d 464 (1948). For the purposes of this case, however, *Hertz* stands for the proposition that a law must bear a reasonable and substantial relation to an end which serves the public interest. 359 Pa. at 47, 58 A.2d at 476. The Pennsylvania Act satisfies this standard.

under *Kroger*. *Kroger* held that § 32 mandates careful scrutiny of any special law regulating trade. Although the Court explicitly deferred the question of what is the appropriate test, I have little doubt that the highest court of this Commonwealth would hold that the legislative classification must have a (1) fair and substantial relationship to the object of the legislation and (2) must substantially further the statutory objective. The first part of the test is derived from previous pronouncements of the Court. *See Moyer v. Phillips*, 462 Pa. 395, 400, 341 A.2d 441, 443 (1973); *In re Estate of Cavill*, 459 Pa. 411, 329 A.2d 503 (1974). A fair and substantial relationship is one which rests "upon some ground of difference which has a fair and substantial relation to the object of the legislation so that all persons similarly circumstanced shall be treated alike." *Kroger*, 481 Pa. at 119, 392 A.2d at 275.

The *Kroger* case itself mandates that the legislation must *substantially* further the statutory objective to pass muster under § 32. 481 Pa. at 121–22, 392 A.2d at 276.[33]

The Pennsylvania Feature Motion Picture Fair Business Practices Law presents a classification which bears a fair and substantial relationship to the legislative objective. I have described the problems specific to the movie industry which the Act addresses. The Act also substantially furthers the statutory objective. While it does not right every wrong, it takes a step toward remedying unfair and deceptive practices which often occur in the licensing of motion pictures.

### IX. *Conclusion*

The effect of the Pennsylvania statute on the businesses of both exhibitors and distributors has been miniscule compared to the competing claims that it is a salvation and damnation. The Act has not materially affected the bottom lines of either the distribution or exhibition businesses. The ingenuity and adaptability of both retailers and wholesalers of movies has far outdistanced the modest proscriptions of the law. Trade screening of prints is a minor problem in the scheme of producing movies. The trade screening requirement seems to concern the middle management cost accountants of the wholesale movie business, but does not materially affect production, distribution or profitability of the business. Trade screening does, however, benefit those exhibitors who use it to select films on the merits of likely box office issues. The requirements of open bidding, prohibiting guarantees and advances and limiting exclusive first runs to 42 days work benefits by promoting wider dissemination of films and fairer trade practices, with little negative impact. Matters of importance in the film business turn on luck, market power, money, sharp dealing and other factors unrelated to the relatively minor and modest trade practice regulation of the Pennsylvania Act.

---

**33.** Even if the Pennsylvania Supreme Court were to apply to Article III, Section 32 of the Pennsylvania Constitution the most stringent test under federal equal protection analysis, *i.e.,* that the law must be necessary to the accomplishment of a compelling state interest, *Palmore v. Sidoti*, ── U.S. ──, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984), the Pennsylvania Act would satisfy that standard.