**ORSON, INC., Plaintiff,**

v.

**MIRAMAX FILM CORP., Defendant.**

No. 93–CV–4145.

United States District Court,
E.D. Pennsylvania.

Oct. 5, 1994.

See also 836 F.Supp. 309.

Niels Korup, Spector, Gadon & Rosen, P.C., Philadelphia, PA, for plaintiff.

Thomas E. Zemaitis, Barbara T. Sicalides, Pepper, Hamilton & Scheetz, Philadelphia, PA, for defendant.

*MEMORANDUM AND ORDER*

JOYNER, District Judge.

This antitrust matter has been brought before the Court by motion of the plaintiff, Orson, which is seeking an order granting it partial summary judgment. The defendant, Miramax Film Corporation (Miramax), has countered with its own motion seeking an award of summary judgment on all counts of Orson's complaint. For the reasons that follow, Orson's motion for partial summary judgment is denied, while Miramax's motion for summary judgment is granted in part and denied in part.

## I. HISTORY OF THE CASE

### A. *The Principals*

Orson is a Pennsylvania corporation that owns and operates the Roxy Screening Rooms, a movie house in Center City Philadelphia. The Roxy operates two screens, each with a seating capacity of 137 persons; and it displays so-called "art films," those films that are viewed as alternatives to mainstream Hollywood fare.[1] The Roxy competes with the Ritz theaters for the patronage of art film-goers in Center City Philadelphia. The Ritz theaters consist of two separate facilities: the "Ritz Five Theaters," which is owned and operated by the Posel Corporation, and the "Ritz at the Bourse," which is owned and operated by the Raysid Corporation. The president of both corporations is Ramon L. Posel, who owns one-half of the outstanding shares of each company. Mr. Posel's brother owns the remaining fifty per cent of each corporation. The Ritz theaters each have five screens and seating capacities ranging from 155 to 375 persons.

Both the Ritz and the Roxy exhibit films distributed by Miramax, a New York corporation that leases feature films, including art films, to movie theaters nationwide. Between January of 1992 and February of 1994, Miramax leased to the Ritz 29 films on a first-run basis and one film on a subsequent-run basis. Over that same period, Miramax leased to the Roxy one film on a first-run basis and 16 films on a subsequent-run basis. Orson alleges in its amended complaint that Miramax and the Ritz enjoy an agreement whereby the Ritz exhibits Miramax films only as long as Miramax grants it an exclusive license for each film. As a result of the agreement, no Miramax film plays contemporaneously at both the Ritz and the Roxy.

### B. *The Amended Complaint*

The amended complaint contains three counts. Counts I and II allege that Miramax's arrangement with the Ritz violates both section one of the Sherman Act[2] and Pennsylvania common law regarding unreasonable restraints of trade.[3] To support its contention, Orson states that it has been unable to secure the right to exhibit Miramax art films on a first-run basis. It claims that Miramax has consistently refused to grant a license to the Roxy, even though the Roxy has offered both to pay a higher percentage of the box office receipts and to exhibit the films on a non-exclusive basis. As for the one film for which Miramax granted a first-run license to the Roxy, "Benefit of the Doubt" starring Donald Sutherland and Amy Irving, Orson claims that Miramax distributed the film, knowing it would be a box office failure, for the purpose of providing it with a post hoc justification for excluding the Roxy from competition with the Ritz. The result of the arrangement between Miramax and the Ritz, alleges Orson, has been to eliminate competition in the art film market, forcing the art film-goer to pay monopoly prices at the Ritz.

---

**1.** Recent films of this discrete genre include "The Crying Game," "Strictly Ballroom," "Like Water for Chocolate," and "Enchanted April."

**2.** The Sherman Act provides that
[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1994).

**3.** The parties agree that Pennsylvania common law follows federal antitrust law as embodied in the Sherman Act. *See Schwartz v. Laundry & Linen Supply Drivers' Union, Local 187*, 339 Pa. 353, 14 A.2d 438 (1940). Thus, Counts I and II of the amended complaint will be treated identically.

Count III alleges that Miramax has violated Pennsylvania's Feature Motion Picture Fair Business Practices Law, 73 Pa.Stat.Ann. §§ 203–1—203–11 (1993) (the Pennsylvania Act). Three specific provisions are at issue. First, Orson contends that Miramax has violated section 203–7, the length of run provision, which prohibits a distributor from granting an exclusive first run to an exhibitor for more than 42 days. The amended complaint specifically details instances in which Miramax films played at the Ritz on a first run basis for more than 42 days.

Second, Orson argues that Miramax has violated section 203–4, the blind bidding provision, which provides that before a distributor and an exhibitor either engage in negotiations or conclude an agreement, the distributor must conduct a trade screening. The facts supporting this allegation are not specifically set forth in the amended complaint, but instead are enumerated in Orson's motion for partial summary judgment. There, Orson contends that Miramax had, on numerous occasions, concluded licensing agreements with the Ritz prior to the trade screenings. Finally, Orson contends that Miramax has violated section 203–8, which sets forth the bidding procedures that exhibitors and distributors must follow if a distributor solicits bids for the licensing of the distributor's films. Again, the facts underlying this charge are largely set forth in Orson's motion for partial summary judgment rather than in the amended complaint.

#### C. The Motions

Orson has filed a motion for summary judgment as to its allegations under the Pennsylvania Act. Miramax has countered with its own motion for summary judgment on all counts of the plaintiff's amended complaint. In its brief in opposition to Miramax's summary judgment motion, Orson argues that the Miramax–Ritz agreement should be declared illegal per se under our antitrust laws. The courts are authorized to make such a declaration if the challenged restraint "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. Columbia Broad-*

*casting,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979).

Since the determination of whether a certain business practice is illegal per se is made at the summary judgment stage, *see id.* at 6, 99 S.Ct. at 1555; *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958), the Court will treat Orson's contention as to the per se illegality of the Miramax–Ritz agreement as a request for summary judgment on its antitrust claim. Thus, the Court will approach this matter as though it had before it cross-motions for summary judgment as to Orson's entire amended complaint.

### II. DISCUSSION

#### A. The Summary Judgment Standard

This Court is authorized to award summary judgment "if the pleadings, depositions ... on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court's responsibility is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citing *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Boiled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512.

In cases where the parties have filed cross motions for summary judgment, as the parties have in the present action, each side

contends that no issues of material fact exist. Yet the standard under which the Court weighs the merits of the motions does not change simply because cross-motions have been filed. *United States v. Hall,* 730 F.Supp. 646, 648 (M.D.Pa.1990). Each party must establish that no issues of fact exist and that it is entitled to judgment as a matter of law. As a result, a case will not necessarily be decided at the summary judgment stage merely because cross-motions have been filed. *Id.* (citing *Rains v. Cascade Indus.,* 402 F.2d 241, 245 (3d Cir.1968)). If an issue of fact exists, both summary judgment motions will fail. With these principles in mind, the Court turns to the substance of the motions.

## B. *The Antitrust Claim*

Orson's amended complaint alleges that Miramax and the Ritz theaters continue to engage in a concerted refusal to deal with the Roxy. This alleged refusal to deal has resulted not only in the Roxy's exclusion from the art film market, but also in the Ritz's realization of monopoly power. The United States Court of Appeals for the Third Circuit has identified the four elements a plaintiff must demonstrate to prove a Sherman Act violation: (1) an agreement or combination, (2) that produced anti-competitive effects within the relevant product and market, (3) that the conspiracy was illegal, and (4) that the conspiracy was the proximate cause of the plaintiff's harm. *J.F. Feeser, Inc. v. Serv–a–Portion, Inc.,* 909 F.2d 1524, 1541 (1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (citations omitted).

For purposes of its motion for summary judgment on the antitrust claim, Miramax concedes that there exists an agreement pursuant to which Miramax refuses to deal with the Roxy, but it maintains that Orson cannot, as a matter of law, demonstrate the second and third elements of the *Feeser* test. Accordingly, Miramax contends that it is entitled to summary judgment on two grounds: (1) because the antitrust laws do not prohibit the Miramax–Ritz agreement; and (2) because Orson has failed to demonstrate any harm to competition as a result of the agreement. Because the Court finds that the Miramax–Ritz agreement does not run afoul of our antitrust laws, Miramax's motion for summary judgment on the antitrust issue is granted.

### 1. *Whether the Miramax–Ritz Agreement is Illegal per se*

■ Because almost all business agreements and contracts restrain trade to some degree, section 1 of the Sherman Act has been construed to make illegal only those contracts and combinations that constitute an unreasonable restraint of trade. *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988); (citing *National Collegiate Athletic Assn. v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 98, 104 S.Ct. 2948, 2958–59, 82 L.Ed.2d 70 (1984)). Whether a business arrangement constitutes an unreasonable restraint of trade is normally determined by applying, on a case-by-case basis, a rule of reason, which considers all relevant factors in examining both the defendants' purpose in implementing the restraint and the restraint's effect on competition. *See Board of Trade of Chicago v. United States,* 246 U.S. 231, 244, 38 S.Ct. 242, 246, 62 L.Ed. 683 (1918).

■ The Supreme Court, however, has recognized that the courts have acquired a sufficient level of familiarity with certain categories of restraints. As a result, these more notorious restraints may be declared illegal per se at the summary judgment stage, eliminating the need for a detailed rule of reason inquiry at trial. These classes of cases include, among others, vertical price-fixing restraints, *see Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911);[4] horizontal

---

4. The term "vertical restraint" describes an agreement between two or more companies on different levels in the chain of product distribution. In *Dr. Miles,* for example, the challenged restraint was an agreement between a drug manufacturer and wholesale dealers to fix resale prices at both the wholesale and retail levels. *Dr. Miles,* 220 U.S. at 374, 31 S.Ct. at 376. Since the Court determined that such arrangements had "for their sole purpose the destruction of competition and the fixing of prices," it de-

price-fixing agreements, *see United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); [5] and group boycotts, *see Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).[6] By contrast, the Supreme Court has elected not to extend the per se rule to vertical non-price restraints. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).[7] In justifying its decision, the *GTE Sylvania* Court noted that while vertical price restraints often suppress both inter-brand and intrabrand competition,[8] vertical non-price restraints were likely to enhance interbrand competition, "the primary concern of antitrust law." *Id.* at 51–52 & nn. 18 & 19, 97 S.Ct. at 2558–59 & nn. 18 & 19.[9]

In light of this precedent, this Court's task is to first classify the restraint at issue before deciding whether the restraint is per se violative of the Sherman Act. Orson first argues that the Miramax–Ritz agreement constitutes a group boycott of the type declared illegal in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), and *Klor's*. In *Klor's*, the Supreme

Court held that "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be [illegal per se]." *Klor's*, 359 U.S. at 212, 79 S.Ct. at 709. And in *General Motors*, the Court held that the joint action of dealers to eliminate competitors was likewise illegal. *General Motors*, 384 U.S. at 140, 86 S.Ct. at 1327–28. Thus, because both *Klor's* and *General Motors* involved a horizontally-imposed boycott, and not the vertical combination at issue here, neither holding compels the Court to declare the Miramax–Ritz agreement illegal per se.

◼ In a rather transparent attempt to bring this case within the scope of the per se rule, Orson argues, in its surreply in opposition to Miramax's summary judgment motion, that a horizontal group boycott exists between the Posel Corporation, owner of the Ritz Five, and the Raysid Corporation, owner of the Ritz at the Bourse. The tragic flaw in this eleventh hour argument is that, throughout the course of the litigation, Orson has treated the Ritz theaters as a single

clared them illegal per se. *Id.* at 408, 31 S.Ct. at 384–85.

**5.** The term "horizontal restraint" connotes an agreement among competitors on the same level of the product distribution chain. The challenged restraint in *Socony–Vacuum* involved an agreement among oil companies to fix prices at an artificially high level. The Court concluded that any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *Socony–Vacuum*, 310 U.S. at 223, 60 S.Ct. at 844.

**6.** In *Klor's*, the Court was confronted by a "group boycott," in which a number of manufacturers and distributors conspired to exclude a retailer from the market. The Court held that such agreements were illegal per se, even absent a specific agreement to fix price. *Klor's*, 359 U.S. at 212, 79 S.Ct. at 709.

**7.** A "vertical non-price restraint" is an agreement between a manufacturer and a retailer that does not specifically concern price. In *GTE Sylvania*, a television manufacturer entered into franchise agreements that prohibited the sale of its product from other than specified locations. Thus, pursuant to the agreement, a retailer was permitted to sell Sylvania televisions from its San

Francisco outlet, but not from an outlet in Sacramento. *GTE Sylvania*, 433 U.S. at 39–40, 97 S.Ct. at 2551–52. The Court held that because of the complexity of vertical non-price restraints and the likelihood that vertical agreements often enhance competition, such agreements were to be evaluated under a rule of reason standard. *Id.* at 58–59, 97 S.Ct. at 2561–62.

**8.** In the context of instant dispute, "interbrand competition" refers to competition among film distributors in the art film market. "Intrabrand competition," on the other hand, refers competition among exhibitors of individual art films. The relief that Orson seeks in this case, a declaration that the exclusive runs at the Ritz are illegal, would serve to foster intrabrand competition: Orson wants the opportunity to exhibit films like "The Crying Game" in direct competition with the Ritz. Interbrand competition would be better served if the relief Orson seeks is denied, however, since a greater number of distributors and films would enjoy access to the Center City Philadelphia market.

**9.** By utilizing vertical non-price restraints, a manufacturer can induce a retailer to provide informational services about a product, repair services, as well as promotional services. Further, vertical non-price restraints work to counteract the so-called "free-rider" effect. *GTE Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560.

entity. For example, Orson asserted in its motion for partial summary judgment that Ramon L. Posel is the principal and president and of both companies, that he books all of the films exhibited at both theaters, and he "runs both theaters as a single facility." Plaintiff's Memorandum in Support of its Motion for Partial Summary Judgment at 4. Later, at page 18, Orson conceded that both Ritz facilities are embodied in one person: "Ramon Posel, who *is* the Ritz." Despite Orson's artful argument, it is clear that no Sherman Act conspiracy can result from the doings of a single man.

In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court held that a parent and its wholly owned subsidiary must be considered as a single enterprise for section one purposes. *Id.* at 771, 104 S.Ct. at 2741–42. Although the Court limited its holding to the situation involving a parent and its wholly-owned subsidiary, the principles that guided the *Copperweld* decision are even more compelling here: "A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Id.* Because the Ritz theaters share common owners and leadership and operate as a single entity, we hold that there can be no Sherman Act conspiracy between them.

Orson's final argument for a favorable resolution at the summary judgment stage is found in Third Circuit precedent suggesting that a per se rule applies to vertical restraints that adversely impact competition at the horizontal level. In *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979), the Third Circuit held that a manufacturer's refusal to deal with a distributor who resold the product for a price less than the price offered by other distributors may constitute a per se violation of section one. *Id.* at 170. The court's holding was based on both the price-fixing element of the restraint and the restraint's horizontal impact. *Id.* In *Sharp*, however, the Supreme Court sharply curtailed the breadth of the *Cernuto* decision, holding that a vertical restraint

would be subject to per se disposition only if it entailed an express or implied agreement to set resale prices. *Sharp*, 485 U.S. at 735–36, 108 S.Ct. at 1525–26. The *Sharp* Court expressly noted that the agreement, and not its effects, is the determining factor in deciding whether a restraint is properly characterized as horizontal: "a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement." *Sharp*, 485 U.S. at 730 n. 4, 108 S.Ct. at 1528 n. 4.

■ Although the restraint at issue may have some effect on a horizontal level, it is clearly a vertical agreement between a distributor and an exhibitor, and therefore the holding in *Sharp* precludes the Court from applying the rule in *Klor's* as to the illegality of a horizontally-imposed boycott. Further, the facts here do not fit into the narrow class of cases imposing per se liability on vertical restraints that concern resale price terms. Accordingly, we hold that the agreement between Miramax and the Ritz does not violate the Sherman Act per se.

### 2. The Reasonableness of the Restraint

■ Having rejected Orson's bid for summary judgment under the Sherman Act, the Court now turns to Miramax's motion for summary judgment and asks whether, after an analysis of the facts on the record under the rule of reason, Miramax must prevail as a matter of law. Thus, the issue here concerns the reasonableness of the Miramax–Ritz agreement, by which Miramax grants exclusive licenses to the Ritz for the exhibition of its art films. Miramax argues that the exclusive licenses are reasonable, and therefore lawful. Orson counters that the agreement is illogical from a business perspective, and as such, it reveals Miramax's true intention in entering into the agreement: to harm the Roxy's competitive position.

The United States Court of Appeals for the Ninth Circuit addressed the antitrust implications of an exclusive license in *Theee Movies of Tarzana v. Pacific Theaters*, 828 F.2d 1395 (9th Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). In that case, the owner of a movie theater brought suit against a competing film

exhibitor and various film distributors, alleging that the distributors and the rival theater collaborated to provide the rival theater with "clearance"[10] over the plaintiff's theater. The plaintiff alleged, as Orson does here, that the granting of exclusive licenses eliminated competition in the relevant market and caused harm to the plaintiff. *Id.* at 1397. The Ninth Circuit concluded, as this Court has today, that movie clearances are vertical non-price restraints subject to a rule of reason analysis. *Id.* at 1398.

In determining the reasonableness of a vertical non-price restraint of trade, the Ninth Circuit and other courts have undertaken an analysis that is mindful of the Supreme Court's admonition that interbrand competition is "the primary concern of antitrust law," *GTE Sylvania,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. Thus, the courts have concluded that vertical non-price restraints are more likely to be lawful if they promote interbrand competition without unduly restricting intrabrand competition. *See Sharp,* 485 U.S. at 724, 108 S.Ct. at 1519–20; *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 190 (2d Cir.1992); *Theee Movies,* 828 F.2d at 1399. Further, with respect to the specific issue of clearances, the courts have noted that clearances are reasonable vertical restraints of trade in circumstances where "the theaters are in substantial competition, and the clearances are used to assure the exhibitor that the distributor will not license a competitor to show the movie at the same time or so soon thereafter that the exhibitor's expected income will be greatly diminished." *Theee Movies,* 828 F.2d at 1399 (citing *United States v. Paramount Pictures,* 334 U.S. 131, 145–46, 68 S.Ct. 915, 923–24, 92 L.Ed. 1260 (1948)).

Applying these principles to the challenged restraint, this Court holds that the clearances at issue here are reasonable. First, while the clearances stifle intrabrand competition to a small degree—no Miramax art film playing at the Ritz can play contemporane-

ously at the Roxy, the clearances serve to stimulate competition between art films distributed by Miramax and art films originating with other distributors. As a result, art film-goers in Center City Philadelphia are offered a wider array of selections from which to choose. Further, it is apparent that the Ritz and the Roxy are in substantial competition. By Orson's own admission, the Ritz and the Roxy are the only two art houses in Center City Philadelphia. Thus, if the Ritz and the Roxy were to exhibit the same film on the same dates, not only would the overall degree of choice be reduced, but the Ritz would assuredly lose income as a result. At its core, Orson's complaint asks the Court to compel Miramax to lease its films to Orson for exhibition at the Roxy. The antitrust laws were not enacted to achieve such ends. Accordingly, the Court grants Miramax's motion for summary judgment on Counts I and II of Orson's complaint.

### C. *Claims under the Pennsylvania Act*

#### 1. *Section 203–7*

Orson alleges in its amended complaint that Miramax has operated in violation of section 203–7 of the Pennsylvania Act, which provides as follows:

> No license agreement shall be entered into between distributor and exhibitor to grant an exclusive first run or an exclusive multiple first run for more than 42 days without provision to expand the run to second run or subsequent run theaters within the geographical area and license agreements and prints of said feature motion picture shall be made available by the distributor to those subsequent run theaters that would normally be served on subsequent run availability.

73 Pa.Stat.Ann. § 203–7 (1993). The evidence on the record demonstrates that 15 Miramax films were exhibited at the Ritz for a period in excess of 42 consecutive days.[11]

---

**10.** "Clearance," in film industry parlance, refers to the exclusivity of the license. Thus, if one theater has clearance for a certain film, a distributor may not grant a license to another theater in a given geographical area while the film is playing.

**11.** These films include "Double Lives of Veronique," "Hear My Song," "Mediterraneo," "Delicatessen," "Zentropa," "Enchanted April," "Reservoir Dogs," "The Crying Game," "Passion Fish," "Strictly Ballroom," "Like Water for Chocolate," "Ethan Frome," "Map of the Hu-

The record further indicates that 9 of the films "expanded" to other Philadelphia area theaters, outside of Center City Philadelphia, before the 42 day period expired, while the remaining 6 films ran at the Ritz without expanding to other area theaters.

### a. Agreement of Exclusivity

■ In order to bring a successful action against Miramax for a violation of this provision, therefore, Orson must show, at the outset, the existence of an agreement of exclusivity. Miramax urges the Court to interpret the statute such that Orson must show that Miramax agreed to grant the Ritz an exclusive license for a period exceeding 42 days. In other words, Miramax would have it that the exhibitor and distributor must agree, at the time of the execution of the contract, that the period of exclusivity would exceed 42 days. Such an interpretation, however, would allow a distributor and exhibitor to circumvent the statute simply by failing to specify a specific date on which the exclusivity of the license would expire. As the Third Circuit has noted, "the [Pennsylvania] Act requires that the exclusive first run must be expanded after 42 days." *Associated Film Distribution Corp. v. Thornburgh,* 800 F.2d 369, 377 (3d Cir.1986), *cert. denied,* 480 U.S. 933, 107 S.Ct. 1573, 94 L.Ed.2d 765 (1987). Thus, the Court holds, for purposes of section 203–7, that there is an unlawful agreement of exclusivity as long the distributor grants an exclusive license to the exhibitor, and the license remains exclusive for a period exceeding 42 days.

■ The statute further provides that in order to trigger 203–7 liability, the license must be exclusive to a certain "geographical area." Miramax argues it complied with the statute when it expanded to other theaters in the area, because the relevant geographical area in the instant case is the greater Philadelphia metropolitan area. By contrast, Orson contends that the expansions were legally irrelevant, because the relevant geographical area is limited to Center City Philadel-

phia. Orson reads the statute as follows: if an exclusive license is granted that provides an exhibitor with clearance in a given geographical area, then the distributor must expand the run to second run theaters located within the geographical area covered by the clearance within 42 days.

The statute's wording is sufficiently vague to permit both readings. As a result, the Court must wade into the murky waters of the provision's legislative purpose in order to settle this issue. The Court first notes that the Pennsylvania Act identifies as one of its purposes to "promote the wide geographical dissemination at reasonable prices to the public of ideas, opinions and artistic expression in feature motion pictures." 73 Pa.Stat. Ann. § 203–2(4) (1993). Further, in *Associated Film Distribution Corp. v. Thornburgh,* 614 F.Supp. 1100 (E.D.Pa.1985), Judge Katz recognized that "[t]he purpose of the provision is to promote the wider dissemination of films in the Commonwealth." *Id.* at 1112. Judge Katz further noted that as a result of the provision, "[s]ome films have opened in suburban and rural areas more quickly." *Id.* While another identified purpose of the Pennsylvania Act is to "foster vigorous and healthy competition" in the film business, § 203–2(3), this Court concludes that the legislature's primary purpose in enacting section 203–7 was not to increase market rivalry among direct competitors, but instead to promote the wide distribution of movies throughout Pennsylvania.

■ Accordingly, Miramax can incur no 203–7 liability for the 9 films that were expanded to other Philadelphia area theaters on or before the forty-third day of their runs at the Ritz.[12] With respect to the 6 films that did not expand to other theaters, however, we conclude that an issue of fact has been raised as to both the existence and the terms of the Miramax–Ritz agreement. We further hold there is sufficient, though not uncontradicted evidence suggesting that an agreement between Miramax and the Ritz existed

man Heart," "Farewell My Concubine," and "The Piano."

**12.** These 9 films include "Hear My Song," "Enchanted April," "Reservoir Dogs," "The Crying Game," "Map of the Human Heart," "Strictly Ballroom," "Ethan Frome," "Farewell My Concubine," and "The Piano."

pursuant to which Miramax granted the Ritz exclusive licenses covering Center City Philadelphia. Further, in 6 instances, the film was not expanded to other theaters within 42 days after the film opened at the Ritz, and the Ritz's license remained exclusive. These circumstances, if proved, comprise a 2–307 violation. Since these facts are in dispute, an award of summary judgment would be unwarranted.

### b. Willful and Intentional Violation

■ Further militating against an award of summary judgment is section 203–10, which provides that "[a]ny exhibitor may bring an action against a distributor or exhibitor or both in the respective court of common pleas wherein the exhibitor's business is located to recover damages sustained by a willful and intentional violation of [t]his act...." 73 Pa.Stat.Ann. § 203–10 (1993). Thus, in order for Orson to prevail on any of its claims arising under the Pennsylvania Act, it must prove not only that it was damaged as a result of Miramax's violation of the Pennsylvania Act, but also that any violation by Miramax was "willful and intentional." First, we note that a triable issue of fact exists as to whether Orson incurred damage as a result of the agreement between Miramax and the Ritz. There is sufficient evidence from which a jury could infer that Orson was damaged by Miramax's unwillingness to expand any of the 6 films to other theaters in Center City Philadelphia.

■ Further, we find that there is a genuine issue of fact as to whether, should Orson be able to demonstrate some violation of the Pennsylvania Act on Miramax's part, the Act was violated willfully and intentionally. This Court notes that summary judgment is rarely awarded in cases in which intent or purpose is at issue. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Coolspring Stone Supply v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993); *Riehl v. Travelers Ins. Co.,* 772 F.2d 19, 24 (3d Cir.1985) ("issues of knowledge and intent are particularly inappropriate for resolution by summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of parties"). Accordingly,

the parties' cross-motions for summary judgment on Orson's 203–7 claim are both denied.

### 2. *Sections 203–4 and 203–8*

■ Orson also contends that it has been damaged as a result of Miramax's alleged violations of sections 203–4 and 203–8. Section 203–4 sets forth the trade screening requirement, providing as follows:

> Blind bidding is hereby prohibited within the Commonwealth. No negotiations between exhibitors and distributors for the licensing or exhibition of a feature motion picture shall take place and no license agreement or any of its terms shall be agreed to for the exhibition of any feature motion picture within the Commonwealth before the feature motion picture has been trade screened within the Commonwealth.

73 Pa.Stat.Ann. § 203–4 (1993). The Act defines a trade screening as "[t]he showing of a feature motion picture by a distributor in recognized exchange cities within the Commonwealth which is open to any exhibitor." § 203–3.

Section 203–8, which sets forth bidding procedures, provides, in pertinent part, as follows:

> (a) **Invitation to bid contents.**—If bids are solicited from exhibitors for the licensing of a feature motion picture within the Commonwealth, then the invitation to bid shall specify the following:
>
>> (1) Whether the run for which the bid is being solicited from exhibitors is a first, second or subsequent run; whether the run is an exclusive or nonexclusive run; and the geographical area for the run.
>>
>> (2) The names of all exhibitors who are being solicited.
>>
>> (3) The date and the hour the invitation to bid expires.
>>
>> (4) The time, date, name and address of the location where the bids will be opened, which location shall be in the exchange centers of this Commonwealth.
>
> *        *        *        *        *        *
>
> (c) **Bid submission and opening.**—All bids shall be submitted in writing and shall be opened at the same time and in the

presence of those exhibitors, or their agents, who submitted bids and are present at such time.

73 Pa.Stat.Ann. § 203–8 (1993). The Pennsylvania Act defines an "invitation to bid" as "[a] written or oral solicitation or invitation by a distributor to one or more exhibitors to bid or negotiate for the right to exhibit a feature motion picture." § 203–3. Orson contends that Miramax violated the blind bidding provision repeatedly by entering into negotiations and reaching licensing agreements for its films prior to the trade screenings. Further, Orson argues that Miramax failed to comply with the Pennsylvania Act's bidding procedures.

Miramax raises a procedural objection to Orson's 203–4 and 203–8 claims. It argues that the claims should be rejected because they were not properly identified in the amended complaint as the grounds upon which Orson claimed an entitlement to relief. This issue centers on Count III of the amended complaint, which lays out the factual predicate for Orson's 203–7 claim, but fails to do the same for the 203–4 and 203–8 claims. On the other hand, the amended complaint asserts an entitlement to relief under the Pennsylvania Act in toto, and not just under 203–7.[13]

▮ Pursuant to the Federal Rules of Civil Procedure, a complaint is sufficient as long as it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Our Court has held that in order for a plaintiff to properly state a claim, it must set forth " 'the aggregate of operative facts which give rise to a right enforceable in the courts.' "

*Smith, Kline & French Laboratories v. A.H. Robins Co.*, 61 F.R.D. 24, 28 (E.D.Pa.1973) (quoting *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.*, 133 F.2d 187 (2d Cir.1943)). Thus, the test for the sufficiency of a complaint requires the plaintiff to set forth a set of facts that serves to put the defendant on notice as to the nature and basis for the claim. *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993); *see Hicks v. Arthur*, 843 F.Supp 949, 959 (E.D.Pa.1994) (complaint "must be sufficient enough to enable the court to make out the potential viable legal theories upon which the complaint is based"). Accordingly, the Court must determine whether the Orson's complaint effectively afforded Miramax with sufficient notice as to the 203–4 and 203–8 claims.

Applying these principles to the instant matter, the Court finds that Orson's amended complaint is legally insufficient as to the 203–4 and 203–8 claims. While Count III of the complaint asserts an entitlement to relief generally under the Pennsylvania Act, and is not limited to relief under the length of run provision, the amended complaint is devoid of any factual basis for the 203–4 and 203–8 claims. The only factual allegation included specifically in Count III concerns the alleged violation of the length of run provision. And while the facts alleged throughout the amended complaint were incorporated by reference into Count III, the Court finds that the allegations contained in the amended complaint as a whole did not serve to provide Miramax with notice that Orson planned to proceed under sections 203–4 and 203–8. Fairness dictates that Miramax be given the opportunity to conduct discovery with knowl-

---

**13.** Count III of the amended complaint reads in full as follows:

*COUNT III*
*VIOLATION OF PENNSYLVANIA FEATURE MOTION PICTURE FAIR BUSINESS PRACTICES LAW*

41. The allegations set forth in paragraphs 1–40 above are incorporated herein by reference.

42. Miramax has consistently granted the Ritz licenses for its feature art films for exclusive first runs for more than 42 days, and, as a consequence, refused to license such films to plaintiff or any other exhibitors in the Philadelphia area served by the Ritz and Roxy theaters. Examples of such excessive exclusive first runs at

the Ritz are "The Crying Game" (10 weeks exclusivity), "Like Water for Chocolate" (over four months exclusivity), and "Strictly Ballroom" (15 weeks exclusivity).

43. Miramax'[s] refusal to license plaintiff in order to honor a license to the Ritz for first-run exclusivity in excess of 42 days is in violation of the Pennsylvania Feature Motion Picture Fair Business Practices Law, 73 P.S. Section 203–1 *et seq.* (the "Act").

44. Miramax'[s] violation was—and continues to be—willful and intentional.

45. Plaintiff has suffered damages as a direct and proximate result of defendant's willful and intentional violation of the Act.

edge of the facts upon which Orson intends to proceed. The amended complaint offers no inkling that Orson will assert an entitlement to relief under 203–4 and 203–8. Because Orson's amended complaint failed to provide Miramax with notice of either the factual basis for the claims under 203–4 and 203–8 or the specific provisions under which Orson intended to proceed, Miramax's motion for summary judgment as to those provisions is granted. Orson will be granted leave to amend its complaint to include claims under sections 203–4 and 203–8, if it so chooses.

## III. CONCLUSION

For the reasons enumerated above, Orson's motion for partial summary judgment is denied. Miramax's motion for summary judgment is granted with respect to the federal and state antitrust claims as well as the claims under Pa.Cons.Stat.Ann. §§ 203–4 and 203–8, but denied with respect to the claim under Pa.Stat.Ann. §§ 203–7. Orson is granted leave to amend its complaint to add the claims under sections 203–4 and 203–8.