ORSON, INC. t/a Roxy
Screening Rooms

v.

MIRAMAX FILM CORP., Appellant
No. 97–1994.

United States Court of Appeals,
Third Circuit.

Argued Sept. 17, 1998.

Submitted en banc July 19, 1999.

Decided Aug. 20, 1999.

Thomas E. Zemaitis, Barbara T. Sicalides, Pepper, Hamilton & Scheetz, Philadelphia, PA,

Carole E. Handler (Argued before panel), Kaye, Scholer, Fierman, Hays & Handler, Los Angeles, CA, Attorneys for Appellant.

Paul R. Rosen, Timothy C. Russell, Spector, Gadon & Rosen, Philadelphia, PA,

Richard J. Perr (Argued before panel), Fineman & Bach, Philadelphia, PA, Attorneys for Appellee.

Lewis A. Grafman, Cozen and O'Connor, Philadelphia, PA, Attorney for Amicus Curiae, National Association of Theatre Owners of Pennsylvania.

Lawrence T. Hoyle, Jr., Hoyle, Morris & Kerr LLP, Philadelphia, PA, Attorney for Amicus Curiae, The Motion Picture Association of America.

Argued: September 17, 1998

Before: SLOVITER, SCIRICA and ALITO, Circuit Judges.

Submitted en banc July 19, 1999

Before: BECKER, Chief Judge, SLOVITER, MANSMANN, GREENBERG, SCIRICA, NYGAARD, ALITO, ROTH, and STAPLETON, Circuit Judges

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The en banc court has granted the Petition for Rehearing filed by plaintiff Orson, Inc., d/b/a Roxy Screening Rooms, and vacated the decision of the panel which held that section 203-7 of the Pennsylvania Feature Motion Picture Fair Business Practices Law, 73 Pa. Stat. § 203-7, was invalid because it was preempted by the federal Copyright Act. *See Orson, Inc. v. Miramax Film Corp.*, 174 F.3d 377 (3rd Cir.1999). Orson argues in its Petition for Rehearing that the panel's decision was foreclosed by previous decisions of this Court. This case directly presents the preemption issue, which the entire court now has the opportunity to examine and decide.

The positions of the parties are fully set forth in their original briefs. In addition, we have received amicus briefs from the Motion Picture Association of America ("MPAA") in support of appellant Miramax Film Corp. and from the National Association of Theatre Owners of Pennsylvania ("Theatre Owners") in support of affirmance. Because the issue is a straightforward one, the court en banc has decided to consider this case on the basis of the submitted briefs.

## I.

### BACKGROUND

Section 106 of the Copyright Act provides that, subject to certain exceptions inapplicable here, the owner of a copyright has:

the exclusive rights to do and to authorize any of the following:

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; [and]

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly.

17 U.S.C. § 106.

Another section of the same statute provides:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 ... are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301.

Section 203–7 of the Pennsylvania Feature Motion Picture Fair Business Practices Law (the "Pennsylvania Act") provides:

No license agreement shall be entered into between distributor and exhibitor to grant an exclusive first run or an exclusive multiple first run for more than 42 days without provision to expand the run to second run or subsequent run theatres within the geographical area and license agreements and prints of said feature motion picture shall be made available by the distributor to those subsequent run theatres that would normally be served on subsequent run availability.

73 Pa. Stat. § 203–7.

Plaintiff Orson, Inc., the owner of a Center City Philadelphia (referred to as "Center City") movie theater, brought suit in August 1993 against Miramax Film Corp., a motion picture production and distribution company, alleging that Miramax violated section 203–7 of the Pennsylvania Act by entering into an exclusive first-run exhibition agreement for more than forty-two days with another Center City theater. *See Orson, Inc. v. Miramax Film Corp.,* 983 F.Supp. 624, 626 (E.D.Pa.1997).

Miramax distributes art films nationally, including in Philadelphia and the surrounding metropolitan area. The parties have not attempted to define "art films" other than as this court did in a prior opinion between the same parties by contrasting "art films" with "movies that may be characterized as 'commercial' or 'mainstream.'" *See Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1362 (3d Cir. 1996) ("*Orson I*"). Only a limited number of theaters in any area exhibit art films.

Orson showed primarily second-run art films from January 1992 through October 1994 through the Roxy Screening Rooms, a Center City movie theater with two screens. The first runs of Miramax's art films were shown in Center City at the Ritz Theaters, a pair of theaters with five screens each, the Ritz Five and the Ritz at the Bourse (collectively, "the Ritz"). During its two and one-half years of operation by Orson, the Roxy received only one first-run movie from Miramax, and rarely received second-run movies after the forty-second day of play at the Ritz, despite repeated requests.

In its complaint, Orson charged that Miramax's distribution of films, specifically in its dealings with the Ritz, violated the Sherman Act, the Pennsylvania common law tort of unreasonable restraint of trade, and section 203–7 of the Pennsylvania Act. The District Court granted Miramax's mo-

tion for summary judgment.[1]  *Orson, Inc. v. Miramax Film Corp.*, 862 F.Supp. 1378, 1390 (E.D.Pa.1994).  We affirmed the judgment for Miramax rejecting Orson's claims that the arrangement by which Miramax granted the Ritz an exclusive license to exhibit its first-run films constituted an illegal restraint of trade and antitrust violation.  *Orson I*, 79 F.3d at 1358.

On the other hand, we vacated the judgment that the District Court had entered for Miramax on Orson's claim under section 203–7 of the Pennsylvania Act because we determined that the District Court had erred in its interpretation of section 203–7.  *Id.* at 1374.  The District Court had construed the statutory requirement that a distributor, such as Miramax, expand the run of the film after forty-two days to other theaters in the "geographical area" to have been satisfied by Miramax's expansion to suburban theaters before the forty-third day of their runs at the Ritz.  *Orson, Inc.*, 862 F.Supp. at 1387.  We held that the relevant geographical area for purposes of section 203–7 was the same area covered by the license, i.e., Center City.  Because the record was disputed or incomplete, we remanded for further proceedings as to whether Miramax's actions as to those films violated section 203–7 of the Pennsylvania Act.  *Orson I*, 79 F.3d at 1374–75.

On remand, the case proceeded to a jury trial, and the jury awarded Orson damages of $159,780.  *See Orson, Inc.*, 983 F.Supp. at 626.  In ruling on Miramax's post-trial motions, the District Court rejected Miramax's challenge to the constitutionality of section 203–7 because it read our decisions in *Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d 808 (3d Cir.1982) (" *AFD I* "), *Associated Film Distribution Corp. v. Thornburgh*, 800 F.2d 369 (3d Cir.1986) ("*AFD II* "), and *Orson I* as upholding the constitutionality of that section.  *Orson, Inc.*, 983 F.Supp. at 630.

On appeal, the panel majority sought to distinguish the language in our earlier decisions and held that section 203–7 conflicts with the Copyright Act. The dissenting judge believed that we were bound by those opinions.  Because we are now en banc, neither the language nor the holdings of those panel decisions bind us here. Therefore, we need not reach the issue of the effect of our prior decisions, and we are free to consider the preemption issue as a matter of law.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

### DISCUSSION

#### A.

█  Before we can consider the effect of the Copyright Act on the validity of section 203–7 of the Pennsylvania Act, we must address the meaning of that provision.  The district courts have characterized the statutory language as vague and uncertain.  *See, e.g., Orson, Inc.*, 862 F.Supp. at 1387 (characterizing statute's wording as "sufficiently vague" to permit alternate readings); *Associated Film Distrib. Corp. v. Thornburgh*, 614 F.Supp. 1100, 1111 (E.D.Pa.1985) ("this part of the statute [section 203–7] was inartfully drafted, and distributors interpret its requirements differently").  As a result, the courts had differing views of a distributor's responsibility.  *See Orson, Inc.*, 862 F.Supp. at 1387 (requirement for expansion after 42 days satisfied because several of the films under consideration " 'expanded' to other Philadelphia area theaters, outside of Center City Philadelphia, before the 42-day period expired."); *Associated Film Distrib.*, 614 F.Supp. at 1123–24 ("The statute does not prevent distributors from contracting for runs longer than six weeks. . . .  The statute also does not prevent a distributor from entering into a series of exclusive licenses with exhibitors as long as each license does not exceed 42

---

**1.** The court found that there was a factual dispute as to six of the nineteen films at issue.

Orson withdrew its claim as to those six films to permit an immediate appeal.

days."); *Associated Film Distrib. v. Thornburgh,* 520 F.Supp. 971, 994–95 (E.D.Pa.1981) ("After 42 days, the film must be reoffered for licensing, and the run must be 'expanded.' ").

Finally, as we noted above, in *Orson I* we construed section 203–7 to "prohibit[ ] a distributor and exhibitor from entering into a license agreement which grants an exclusive first-run for more than 42 days without providing for expansion in the same geographical area covered by the license [here, Center City Philadelphia]." *Orson I,* 79 F.3d at 1374. One of the amici curiae, the Theatre Owners, takes issue with that construction. It argues that because we are en banc we can revisit the forty-two day rule in its entirety, and suggests that we construe it in a manner that does not lead to its unconstitutionality.

Amicus Theatre Owners recognizes that the Pennsylvania General Assembly "may very well have wanted to require that the first-run be expanded after 42 days," but it argues that "there is nothing in the statutory language which mandates that the first run must be expanded on the 43rd day." Theatre Owners Br. at 6. It states that all that the forty-two day rule requires is that provision must be made in the licensing agreement to expand the run if the term of the licensing agreement exceeds forty-two days and that "it is entirely consistent with federal copyright law for the distributor to enter into multiple licenses of 42 days each, or in good faith to consider multiple requests by exhibitors to license on the 43rd day but to reject on a reasonable business basis such requests to license." Theatre Owners Br. at 7.

This is of course the construction that this court rejected in its earlier opinions. *See AFD II,* 800 F.2d at 377. Although we agree with the Theatre Owners that we are free to revisit our statutory construction, we cannot accept its proffered interpretation of the language. We see no reason why the Pennsylvania legislature would have permitted consecutive forty-two day licenses to the same exhibitor.

We believe the panel in *Orson I* correctly construed the language of section 203–7 to prohibit a motion picture distributor from entering into an exclusive first run arrangement for more than forty-two days. *See Orson I,* 79 F.3d at 1374. We thus cannot avoid deciding whether imposition of such a requirement on the copyright holder is preempted by the federal Copyright Act.

### B.

The Supreme Court has recognized three ways in which federal law may preempt, and thereby displace, state law: (1) "express preemption," (2) "field preemption" (which is also sometimes referred to as "implied preemption"), or (3) "conflict preemption." *See Pacific Gas & Elec. Co. v. Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *International Paper Co. v. Ouellette,* 479 U.S. 481, 491, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Express preemption arises when there is an explicit statutory command that state law be displaced. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 382, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). An example of express preemption can be found in the subsection of the Employee Retirement Income Security Act of 1974, stating that the provisions of that Act "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

Under field or implied preemption principles, state law may be displaced "if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (internal quotation marks omitted).

Finally, state law may be displaced under conflict preemption principles if the state law in question presents a conflict

with federal law in one of two situations: when it is impossible to comply with both the state and the federal law, *see Pacific Gas,* 461 U.S. at 204, 103 S.Ct. 1713, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977).

As the Court has noted, these categories are not necessarily airtight. *See English v. General Elec. Co.,* 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) ("By referring to these three categories, we should not be taken to mean that they are rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.").

The Copyright Act contains an express preemption provision in § 301, which states, in relevant part:

> On and after January 1, 1978, *all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright* as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, *are governed exclusively by this title.* Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (emphasis added). The exclusive rights in the copyrighted work granted by the Act are reproduction; preparation of derivative works; distribution by sale, rental, lease or lending; public performance, in the case of motion pictures or audiovisual works; and public display of individual images from motion pictures or audiovisual works. 17 U.S.C. § 106.

State laws, whether statutory or common law, are subject to express preemption under Copyright Act § 301 only if they create rights that are "equivalent" to the exclusive rights within the general scope of copyright. *See* 17 U.S.C. § 301(a); *see also Ehat v. Tanner,* 780 F.2d 876, 878 (10th Cir.1985) (holding that because literary works, including compilations and derivative works, are within the subject matter of copyright, state common law that purported to protect a work for which plaintiff's copyright action was unsuccessful was preempted); 1 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 1.01[B][1] (1998) (discussing various state law causes of action).

As noted above, conflict preemption may arise either because " 'compliance with both regulations is a physical impossibility' or because the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Jones,* 430 U.S. at 525, 97 S.Ct. 1305; *see also Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). The purposes and objectives of Congress, which appear in the Copyright Act, are to implement a nationally uniform system for the creation and protection of rights in a copyrighted work. *See Goldstein v. California,* 412 U.S. 546, 561, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) (turning "to federal copyright law to determine what objectives Congress intended to fulfill").

An illustration of conflict preemption under the Copyright Act is provided by *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 710–11, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). That case concerned an Oklahoma state law that banned advertising of alcoholic beverages by cable operators. However, the Copyright Revision Act of 1976 established a program of compulsory copyright licensing under the regulations of the Federal Communications Commission (FCC) pursuant to which a cable operator

could transmit signals out of state upon payment of service royalties. The Supreme Court held that the Oklahoma law was preempted, not only because the FCC had explicitly preempted the area, but also because the state law would destroy or interfere with the exercise of a federally created copyright right. *Id.* at 710–11, 104 S.Ct. 2694; *see also* 1 Nimmer & Nimmer, *supra,* § 1.01[B][3]. *Cf. Storer Cable Communications v. City of Montgomery,* 806 F.Supp. 1518, 1534 (M.D.Ala.1992) (city ordinance requiring cable programming provider to license programs to additional entities unconstitutional through either § 301 or conflict preemption).

A further illustration is provided by the recent opinion in *Rodrigue v. Rodrigue,* 55 F.Supp.2d 534 (E.D.La.1999). In that case, the divorced wife of an artist, who had registered some of his paintings, relied on Louisiana's community property law to seek one-half of his copyright ownership rights in the paintings authored by him during the marriage. The district court held the Louisiana community property law to be preempted on the question of ownership of copyright, reasoning that the operation of community property law in this setting would conflict with Congress's intention to vest copyright in the author alone at the time of the creation of the work. *See id.* at 540–42. *But see In re Marriage of Worth,* 195 Cal.App.3d 768, 241 Cal.Rptr. 135 (1987).

In this case, Miramax argues both express preemption and conflict preemption. Although both may be applicable, because our analysis more closely parallels that used in cases applying conflict principles, we proceed on that ground. Before we do so, it is necessary to understand the forces behind the passage of the Pennsylvania Act.

### C.

The distribution of motion pictures has been the subject of attention since at least the 1940s when the Department of Justice filed antitrust suits attacking certain business practices prevailing within the industry. *See generally United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (requiring distributors to divest ownership of exhibition theaters). Again, in 1968 the effort of the Department of Justice to correct certain distributors' business practices resulted in stipulations in effect from 1969 to 1975 which restricted the number of blind-bidding films placed on the market by any single distributor.[2] *See Allied Artists Pictures Corp. v. Rhodes,* 496 F.Supp. 408, 417 & n. 6 (S.D.Ohio 1980), *aff'd in relevant part and remanded in part,* 679 F.2d 656 (6th Cir.1982); Patrick McNamara, "Copyright Preemption: Effecting the Analysis Prescribed by Section 301," 24 *Boston College L.Rev.* 963, 990 (1983) (citing *United States v. Paramount Pictures,* Civ. Action 87–273 (S.D.N.Y. Aug. 14, 1968)).

The exhibitors and their trade association then lobbied state legislatures to adopt laws that prohibited blind bidding, and nearly half the states did so between 1978 through 1983. *See* Kathy Herman, Comment, "Anti–Blind Bidding Legislation in the Motion Picture Industry: *Associated Film Distribution Corp. v. Thornburgh,*" 5 *J.L. & Com.* 293, 299 (1984).

The Pennsylvania Act is one of the most comprehensive of the regulatory statutes enacted in that period. *See Associated Film Distrib.,* 520 F.Supp. at 979 (describing Pennsylvania's Act as "more comprehensive" than "Ohio's comparatively limited regulation"); *see also* Herman, *supra,* 5 J.L. & Com. at 304. Its provisions prohibiting blind bidding, prohibiting advances, and limiting minimum guarantees are com-

---

**2.** In the mid–1980s, the Department of Justice also proceeded against improper market practices by theater exhibitors themselves. *See generally* Stanley I. Ornstein, "Motion Picture Distribution, Film Splitting, and Antitrust Policy," 17 *Hastings Comm. & Ent. L.J.* 415 (1995).

parable to regulation by other states of several aspects of the licensing and distribution practices for exhibition of films, and Miramax does not challenge those regulatory provisions before us.

The legislative findings and purposes included in the Pennsylvania Act set forth a litany of the unfair market practices the state sought to prevent or ameliorate.[3] One of the most egregious practices was that of blind bidding: the marketing and licensing of a film prior to its completion and without offering exhibitors a chance to trade screen the final product. As a result, distributors could make deceptive claims regarding films offered for bidding. *See Associated Film Distrib.*, 614 F.Supp. at 1107 (discussing the distributors' practice of promoting films based on multiple screen stars who had only cameo roles or who were never seen together in a single scene); *see also Allied Artists Pictures*, 496 F.Supp. at 429–30 (describing information from distributors as "scant and sometimes misleading"). The Pennsylvania Act prohibits this practice. *See* 73 Pa. Stat. §§ 203–4, –8(b).

Closely tied to the problem of blind bidding was the unfairness in the bidding process itself which occurred when distributors would unseal closed bids in collusion with a favored exhibitor (the use of "five o'clock looks") in order to enable the exhibitor to offer a sufficiently high bid to obtain the film. *See Associated Film Distrib.*, 614 F.Supp. at 1112 ("Collusion between favorites often controlled the bidding for pictures."); *Allied Artists Pictures*, 496 F.Supp. at 430. There was even talk that some distributors simply disregarded all the bids and awarded a license to a favored exhibitor. *See Allied Artists Pictures*, 496 F.Supp. at 430.

To curtail these practices, the Pennsylvania Act requires that distributors issue invitations to bid that contain, in addition to the usual information, the names of all exhibitors invited to bid, and the day, time, and location for bid opening. *See* 73 Pa. Stat. § 203–8(a)–(c). The Pennsylvania statute also requires that exhibitors be able to examine all the bids. *See* 73 Pa. Stat. § 203–8(d).[4]

Another industry practice that Pennsylvania considered ripe for reform was the use of minimum guarantees and advances, *see Associated Film Distrib.*, 614 F.Supp. at 1109–10, which shifted the risks of unsuccessful exhibitions from distributors to exhibitors, who were required to pay fixed sums in advance of showing, *see Allied Artists Pictures*, 496 F.Supp. at 418. The provisions of the Pennsylvania Act directed to this practice prohibit minimum guarantee payments if there is also "a fee or other payment ... based in whole or in part on the attendance or box office receipts," 73 Pa. Stat. § 203–5, and prohibit advance payments in contracts for exhibition, *see* 73 Pa. Stat. § 203–6.

In *AFD II*, we recognized that statutes that bar exaction of advances from exhibitors, limit guarantees, and regulate the bidding and negotiation process may keep a distributor from achieving the optimal monetary return for the film. *See AFD II*, 800 F.2d at 376 (citing *AFD I*, 683 F.2d at 816 (quoting *Allied Artists Picture*, 679 F.2d at 662–63)). Nonetheless, we concluded that a reasonable government regulation that seeks to remedy problems caused by the economic disparity that impedes fairness in bargaining and honesty in business dealings is not impermissible

---

**3.** These legislative concerns included, *inter alia,* undue control of exhibitors; restraint, destruction, or inhibition of fair and honest competition; unfair and deceptive acts or practices; and withholding full information regarding prospective motion picture purchases or rentals in a blind-bidding process. *See* 73 Pa. Stat. § 203–3.

**4.** In *Associated Film Distribution,* the district court observed that the Pennsylvania Act "permits oral bid solicitation and oral bids." 614 F.Supp. at 1112. Although the Act does not expressly permit an oral invitation to bid and bidding process, neither does it expressly prohibit either action.

merely because it has an economic effect on those regulated.

These market regulations, which we upheld in *AFD II* and *Orson I*, do not create a preemption issue because they only touch copyrighted works indirectly, if at all. However, a state regulatory scheme that is "copyright-based in essence" presents a different matter. *See* 1 Nimmer & Nimmer, *supra*, § 1.01[B][3][c] at 1–65. The forty-two day exclusive first-run license limitation in section 203–7 of the Pennsylvania Act is a distinctly different regulation from those within the state's power over improper market practices. If the state's ban on exclusivity after forty-two days directly regulates a right that is protected by federal copyright law, it must, of necessity, be preempted under conflict preemption principles.

■ Applications of these well-established legal principles to section 203–7, as construed in *Orson I* and as we construe it today, lead to the ineluctable conclusion that the section cannot stand because it prohibits the copyright holder from exercising rights protected by the Copyright Act. Among the "exclusive rights" granted under § 106 in the Copyright Act are the rights to "distribute" and to "perform the copyrighted work publicly." However, section 203–7 requires the distributor to expand its distribution after forty-two days by licensing another exhibitor in the same geographic area, even if such expansion is involuntary and uneconomic. *See* MPAA Br. at 10 (uneconomic for first-run theater to exhibit art film simultaneously exhibited in same geographic market).

A distributor who exercises its federal right to grant an exclusive license to an exhibitor of choice will be subject to liability under the Pennsylvania Act for refusing to grant licenses to other exhibitors in the same geographic area after the forty-second day. The potential for liability under the state law for the copyright holder's exercise of its federal rights became a reality in this case and illustrates the conflict created by the Pennsylvania Act. It is evident that the Pennsylvania Act regulates the essence of the federally protected copyright.

■ That a copyright encompasses the right to refuse to license was reiterated by the Supreme Court in a decision postdating *AFD I* and *AFD II* which stated that the Copyright Act grants a copyright owner "the capacity arbitrarily to refuse to license one who seeks to exploit the work." *Stewart v. Abend*, 495 U.S. 207, 228–29, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (citing *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S.Ct. 546, 76 L.Ed. 1010 (1932)); *see also Schnapper v. Foley*, 667 F.2d 102, 114 (D.C.Cir.1981) (vesting "the liberty not to license rights in his work"); *Lawlor v. National Screen Serv. Corp.*, 270 F.2d 146, 154 (3d Cir.1959) (recognizing corollary right under copyright law to exclude others under licensing right).

In *Storer Cable*, 806 F.Supp. 1518, the court considered a challenge to a local ordinance that raised a presumption that cable programmers who entered into exclusive licenses for the broadcast of their programming were engaging in proscribed conduct. Although the city defended its ordinance as a legitimate antitrust and pro-competition regulation, the court held it was preempted because "a presumption that exclusive licensing contracts are illegal is ... not amenable to any saving construction." *Id.* at 1540. The court noted that "[a] party who holds a copyright for cable programming and who does no more than grant another an exclusive distribution or exhibition license is then in automatic jeopardy of liability as a result of these sections, as is the licensee." *Id.* at 1539.

■ Orson argues that once a copyright holder, such as Miramax, makes an initial distribution, a state is free to regulate the manner in which the work is thereafter distributed. We reject Orson's contention. In *College Entrance Examination Board v. Pataki*, 889 F.Supp. 554 (N.D.N.Y.1995), the court addressed a New York state law

that required the owners of copyrights in certain standardized tests, which were used, *inter alia*, for graduate school admissions, to file copies of those tests with the state after they were administered. The court held that the New York law improperly interfered with the copyright holders' rights under § 106 because it required reproduction and distribution of the copyrighted tests in the face of the owners' desire not to do so.

A similar analysis is applicable in this case. Congress determined that the copyright holder should be granted exclusive rights under § 106, albeit for a limited period. Although a state regulation falling within the federally established exceptions to those rights, such as fair use, *see* 17 U.S.C. § 107, may obligate a copyright holder to change its practices to accommodate such uses, *see, e.g., Association of Am. Med. Colleges v. Cuomo* 928 F.2d 519, 525–26 (2d Cir.1991) (remanding to district court to make factual findings on whether existing state law constitutes fair use), the parties here have not suggested, nor can we conclude, that the regulation enacted through section 203–7 falls within one of the Copyright Act's exceptions.

Rather, the Pennsylvania Act, like the New York law regulating standardized tests, would impose on copyright holders, contrary to their exclusive rights under § 106, an obligation to distribute and make available other copies of the work following their initial decision to publish and distribute copies of the copyrighted item. Although it is true, as Orson points out, that the examiners in *Association of American Medical Colleges* and in *College Entrance* engaged in extensive efforts to prevent disclosure of their tests, *see* Appellee Br. at 17 n. 10, this factor does not change the fundamental principle underlying these cases: the state may not mandate distribution and reproduction of a copyrighted work in the face of the exclusive rights to distribution granted under § 106.

Even Orson's own quotation of *Warner Bros., Inc. v. Wilkinson,* 533 F.Supp. 105 (D.Utah 1981), *appeal dismissed and case remanded,* 782 F.2d 136 (10th Cir.1985), another decision discussing an anti-blind-bidding statute, supports our distinction between regulations that are designed to assure a fair market and honest business dealings and those that direct a copyright holder to distribute and license against its will or interests. That court stated,

> The right to transfer or license copyrighted material for use by others under sections 106 and 201 *et seq.* of the Copyright Act has never encompassed a right to transfer the work at all times and at all places free and clear of all regulation; it has meant that the copyright owner has the *exclusive right* to transfer the material for a consideration to others.

533 F.Supp. at 108 (emphasis added). Nothing in that quotation detracts from the copyright owner's exclusive federal right to decide to whom it will transfer the work. Moreover, the language from the same paragraph serves to support precisely the point made herein; as the *Warner Bros.* court stated, "No one has appropriated a product protected by the copyright law for commercial exploitation *against the copyright owner's wishes." Id.* at 108 (emphasis added).

Unlike the provisions in the Pennsylvania Act that are directed to market practices that have no counterpart in the Copyright law, section 203–7 conflicts with the Copyright Act's grant to the copyright holder of an exclusive right to distribute and license a work, and it therefore follows that it is preempted.

### III.

In conclusion, we hold that because section 203–7 of the Pennsylvania Feature Motion Picture Fair Business Practices Law "stands as an obstacle" to the federally created exclusive rights given to a copyright holder, namely, the exclusive right to distribute the copyrighted work, it is

preempted by the federal Copyright Act.[5]

For the reasons set forth above, we will reverse the decision of the District Court denying Miramax's Motion for Judgment as a Matter of Law and we will direct it to enter judgment for Miramax.

5. In light of our conclusion, we need not address Miramax's objections to the trial proceedings.